UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ANTHONY GATTINERI, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | ) <br> ) |
| WYNN MA, LLC and WYNN RESORTS, LIMITED | ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

## COMPLAINT AND JURY DEMAND

### Introduction

This action arises from Wynn MA, LLC's and Wynn Resorts, Limited's calculated refusal to honor their contract with Plaintiff, Anthony Gattineri. Anthony Gattineri is a 46.69% member of FBT Everett Realty, LLC. FBT previously owned the land in Everett and Boston, Massachusetts where the Encore Boston Harbor (formerly, Wynn Boston Harbor) casino is being built and is expected to open in June of 2019. On December 19, 2012, FBT and Wynn entered into an Option Agreement providing Wynn the option to purchase the FBT property for $75 Million if Wynn was awarded a casino license for the FBT property by the Massachusetts Gaming Commission. Wynn seized upon the Gaming Commission's unfounded concerns about FBT's ownership to participate in a plan to lower the price it would pay FBT for its property by $40 Million in order to advance its efforts for a casino license.

During the Gaming Commission's investigation into Wynn's suitability to operate a casino on FBT's property, the Gaming Commission became wrongly concerned that FBT had additional owners beyond the three who had been previously disclosed to investigators. Wynn

claimed in early November, 2013 that the Gaming Commission had informed it that Wynn could not proceed with the purchase of the FBT property as set forth in the Option Agreement.  Wynn thereupon agreed with the Gaming Commission that it lower the price to be paid for FBT's property to an amount equal to the "non-casino value" of the property to ensure that no one (including FBT's innocent owners) received a so called "casino premium."  Wynn provided the Gaming Commission with its appraiser's "non-casino value" of $35 million, a $40 million price reduction windfall to Wynn.  Anthony Gattineri was opposed to accepting a lower price, insisting that the FBT site was worth far more than $35 million for a non-casino development.  Without the approval of Anthony Gattineri, and without the need for his authorization as a minority, non-managerial owner, FBT, through its Manager, agreed to accept the lower price.  And the Gaming Commission, on December 13, 2013, accepted Wynn's price reduction to "cure" what turned out to be unfounded concerns over concealed ownership of the FBT Property.

The Gaming Commission, however, threw Wynn a curveball.  Although it accepted Wynn's proposal to pay $40 million less to FBT, to which FBT's Manager had agreed, the Gaming Commission unexpectedly added an additional required condition to its continued favorable consideration of the award of the only Greater Boston casino license to Wynn: the Gaming Commission required Wynn to submit separate Certificates from each individual FBT member certifying, under oath, their ownership in FBT for themselves only and no other persons or entities.  Those Certificates were not part of Wynn's presentation to the Gaming Commission.  Anthony Gattineri, whose signature was now, for the first time, needed, refused to sign any Certificate and his refusal caused a potentially fatal problem for Wynn's licensing prospects.  Wynn, through its representatives, including former Massachusetts Governor William Weld, threatened Anthony Gattineri with the dissemination of adverse media reports and with dire

economic consequences in its attempts to persuade Anthony Gattineri to sign the Certificate required by the Gaming Commission.

Despite these threats, on most of which Wynn ultimately made good, Anthony Gattineri steadfastly refused to sign the Certificate and consistently maintained that (1) the FBT property was worth far more than the lowered price of $35 million for alternative development and (2) signing the Certificate might jeopardize his legal rights and he had no reason to take any such risk.  In June 2014, Wynn assigned Robert DeSalvio, its senior executive, to do "whatever it takes" to solve what Wynn called "The Gattineri Problem."   Without a signed Certificate from Anthony Gattineri, Wynn could not of course satisfy the Gaming Commission's conditions for obtaining the casino license.

On June 14, 2014, as a hard deadline to obtain Anthony Gattineri's Certificate rapidly approached, Robert DeSalvio flew to San Diego, California to meet in person with Anthony Gattineri, who was there visiting his children.  At their San Diego meeting, Robert DeSalvio directly asked Anthony Gattineri what it would take to get him to sign his Certificate.  Anthony Gattineri responded that he wanted to be made whole on his percentage of the $40 Million windfall to Wynn from the purchase price reduction.  Robert DeSalvio assured Anthony Gattineri that it was not Wynn's intention to obtain a windfall from the reduced purchase price of the casino site, but that it was only trying to satisfy the Gaming Commission.  Robert DeSalvio then made Anthony Gattineri the following offer: if Anthony Gattineri signed the required Certificate and Wynn obtained the casino license for a casino on the FBT  property and bought the property, Wynn would "make Anthony Gattineri whole" by providing him with his percentage of the purchase price reduction (which is $18,676,000).

Anthony Gattineri agreed and he and Robert DeSalvio then shook hands on the agreement.  Within hours of the San Diego Agreement, and after six months of refusing to sign the Certificate in the face of tremendous pressure, threats, and stated concerns, Anthony Gattineri signed his Certificate and delivered it by overnight courier for presentation to the Gaming Commission.  Only three months later, in September, 2014, the Gaming Commission awarded the casino license to Wynn for the FBT site and Wynn purchased the FBT property a few months later at the lowered price of $35 million, representing a $40 million windfall to Wynn, subject to Wynn's agreement to make Anthony Gattineri whole.  The following month, October, 2014, Anthony Gattineri was charged in both Federal and State Court with alleged crimes in connection with the sale of the FBT property to Wynn.  In May of 2016, Anthony Gattineri was acquitted of all Federal charges and all Massachusetts charges were subsequently dropped.

Anthony Gattineri has, since his acquittal and exoneration, met and communicated with Robert DeSalvio and specifically asked Mr. DeSalvio not to make him beg for his money.  Mr. DeSalvio did not deny that Wynn owed Mr. Gattineri the money to make him whole.  Wynn, however, has refused to either make the agreed payment to Anthony Gattineri or to make arrangements to do so.  It now seems painfully apparent that Wynn never had any intention of honoring its agreement to make Anthony Gattineri whole and, instead, merely had Robert DeSalvio promise whatever was necessary to solve "The Gattineri Problem" in order to remove an impediment to Wynn's being awarded the coveted sole Greater Boston casino license.

## PARTIES

1.  The Plaintiff, Anthony Gattineri ("Mr. Gattineri"), is an individual residing in Vero Beach, Indian River County, Florida.  Mr. Gattineri is a 46.69% member of FBT Everett Realty, LLC ("FBT").

2.     Defendant, Wynn MA, LLC, is a limited liability company organized under the laws of the State of Nevada with a principal place of business located at 3131 Las Vegas Boulevard South, Las Vegas, Nevada 89109.  Wynn MA, LLC is wholly owned by its sole member, Wynn Resorts, Limited, a publicly traded Nevada corporation.

3.     Defendant, Wynn Resorts, Limited (Wynn MA, LLC and Wynn Resorts, Limited are together referred to herein as "Wynn") is a publicly traded Nevada corporation with a principal place of business located at 3131 Las Vegas Boulevard South, Las Vegas, Nevada 89109.  Wynn Resorts, Limited is the sole owner/member of Wynn MA, LLC.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction in this matter under 28 U.S.C. §1332 as there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

5.     Venue is appropriate in this Court because, pursuant to 28 U.S.C. § 1391(b)(1) and (c)(2), Wynn, both of which are registered to conduct business in Massachusetts, is deemed to "reside" in Massachusetts.

## FACTS COMMON TO ALL COUNTS

6.     Mr. Gattineri is a 46.69% member of FBT.  FBT was the owner of the land located in Everett and Boston, Massachusetts (the "Casino Parcel") where Wynn is currently building the Encore Boston Harbor casino (previously known as the Wynn Boston Harbor).

7.     On December 19, 2012, Wynn and FBT entered into an Option Agreement providing Wynn the option to purchase the Casino Parcel from FBT for $75 million if Wynn was awarded a casino license for the Casino Parcel (the "Option Agreement").

8. At the time of the sale of the Casino Parcel to Wynn, the only members of FBT were Paul Lohnes ("Mr. Lohnes"), The DeNunzio Group, LLC (Dustin DeNunzio, Manager ("Mr. DeNunzio") and Mr. Gattineri.

9. In January 2013, Wynn filed an application with the Massachusetts Gaming Commission (the "Gaming Commission") for a license to operate a destination resort casino on the Casino Parcel.

10. During the application process, the Gaming Commission, through its Investigation and Enforcement Bureau ("IEB"), became wrongly concerned that one or more persons other than Mr. Lohnes, Mr. DeNunzio and Mr. Gattineri had ownership or membership interests in FBT. The IEB informed Wynn that the IEB's concern over FBT ownership jeopardized Wynn's casino license application.

11. In order to advance its prospects for a casino license on the Casino Parcel, Wynn responded to the Gaming Commission's (or the IEB's) unfounded concerns about FBT's ownership and agreed to a plan to lower the price it would pay for the Casino Parcel by $40 million.

12. Wynn agreed with the Gaming Commission to lower the price to be paid for FBT's property to an amount equal to the so-called "non-casino value" of the Casino Parcel to ensure that no one received from its purchase a so called "casino premium." Wynn provided the Gaming Commission with its own appraiser's "non-casino value" of $35 million for the Casino Parcel.

13. Mr. Gattineri was opposed to accepting a lower price, insisting that the Casino Parcel was worth far more than $35 million for a non-casino development.

6

14. Without the approval of Mr. Gattineri, and without the need for his authorization as a minority owner, FBT, through its Manager, agreed to accept the lower price for the Casino Parcel.

15. On December 13, 2013, the Gaming Commission accepted and approved of the plan to lower the purchase price for the Casino Parcel, accepted Wynn's $35 million non-casino valuation for the Casino Parcel and agreed that, at the reduced price, the purchase from FBT would not be objectionable to the Gaming Commission, and would not adversely affect Wynn's application for the casino license.

16. The Gaming Commission, however, added an extra condition to its approval for which Wynn had not anticipated or planned. As a required condition of the acceptance of Wynn's price reduction proposal to permit the Gaming Commission to award the only Greater Boston casino license to Wynn, the Gaming Commission required Wynn to submit to it separate Certificates from each individual FBT owner/member certifying, under oath, their ownership in FBT for themselves only and no other persons or entities.

17. On December 23, 2013 Mr. Lohnes and Mr. DeNunzio provided the Gaming Commission with their signed Certificates.

18. Mr. Gattineri, whose signature was now, for the first time, needed, refused to sign any Certificate. Mr. Gattineri's refusal to sign his Certificate caused potentially fatal problems for Wynn's licensing prospects.

19. Beginning in early 2014, through a series of meetings in Massachusetts and telephone calls when Mr. Gattineri was in Massachusetts, some of which included and/or were initiated by former Massachusetts Governor William Weld ("Governor Weld") who was then acting as legal counsel to Wynn in connection with its attempts to obtain a casino license, Mr.

Gattineri was implored to sign his Certificate. Robert DeSalvio ("Mr. DeSalvio"), a Wynn senior executive, and one or more of Mr. Gattineri's lawyers also participated in some of these meetings and telephone calls.

20. During several of these meetings and telephone calls with Wynn representatives in Massachusetts, Mr. Gattineri was repeatedly threatened with dire economic consequences and adverse media reports if he did not sign the Certificate. Wynn ultimately made good on most of its threats to Mr. Gattineri.

21. Despite Wynn's threats, Mr. Gattineri still refused to sign the Certificate and maintained that the Casino Parcel, even for a non-casino use, was worth far more than the lowered price of $35 million.

22. On or about March 11, 2014, former Governor Weld called Mr. Gattineri's lawyer from Costa Rica to apply more pressure on Mr. Gattineri to sign the Certificate that Wynn desperately needed as part of the Gaming Commission's licensing requirements. Mr. Gattineri continued to refuse to sign the Certificate.

23. On or about April 10, 2014, Boston Globe reporter Andrea Estes, having been fed the information by Wynn or persons acting on its behalf, asked Mr. Gattineri's attorney to confirm that Mr. Gattineri was willing to sign the Certificate if Wynn agreed to the originally contracted $75 million purchase price and that Wynn doing so would resolve Mr. Gattineri's objection to the sale to Wynn.

24. On or about April 27, 2014, former Governor Weld proposed to Mr. Gattineri's attorney a modified or indirect Certificate. Mr. Gattineri refused this request.

25. On or about April 30, 2014, Jacqui Krum, Esquire, General Counsel for Wynn ("Attorney Krum"), asked to meet with Mr. Gattineri's attorney. On May 3, 2014, Attorney

Krum had a telephone call with Mr. Gattineri's attorney and implored him to have Mr. Gattineri sign the Certificate.  Mr. Gattineri again refused to sign the Certificate.

26. Wynn was getting increasingly desperate for Mr. Gattineri to sign the Certificate so it could proceed with its multi-billion dollar casino on the Casino Parcel.  From the beginning of 2014 through June of 2014, Mr. Gattineri's refusal to sign his Certificate was dubbed by Wynn as "The Gattineri Problem."

27. In June, 2014, Mr. DeSalvio (as he told Mr. Gattineri) was assigned by Wynn to do "whatever it takes" to solve The Gattineri Problem.  Mr. DeSalvio contacted Mr. Gattineri who was, at the time, visiting his daughters in San Diego, California.  Mr. DeSalvio offered to fly to San Diego to meet with Mr. Gattineri in person.  Wynn sent Mr. DeSalvio to San Diego for the sole purpose of doing whatever was necessary to get Mr. Gattineri to sign the Gaming Commission's required Certificate.

28. On the morning of June 14, 2014, Mr. DeSalvio and Mr. Gattineri met at 10:00 a.m. for breakfast at the Westgate Hotel in San Diego, where Mr. DeSalvio had spent the night (the "San Diego Meeting").  At the San Diego Meeting, Mr. Gattineri again refused to sign the Certificate telling Mr. DeSalvio that he saw no reason for the $40 million windfall to Wynn resulting from the reduction in purchase price.  Mr. Gattineri also reiterated to Mr. DeSalvio that he was very confident that the Casino Parcel was worth at least $75 million, if not more, for non-casino uses.

29. Mr. DeSalvio asked Mr. Gattineri at the San Diego Meeting what it would take for Mr. Gattineri to finally sign the Certificate.  Mr. Gattineri told Mr. DeSalvio that he wanted to be made whole on his percentage of the $40 million windfall to Wynn from the purchase price reduction.

30. Mr. DeSalvio assured Mr. Gattineri that it was not Wynn's intention to obtain a windfall from the purchase of the Casino Parcel, but that it was only trying to satisfy the Gaming Commission.

31. Mr. DeSalvio, with Wynn's authority and knowledge, offered Mr. Gattineri that if he signed the required Certificate, and Wynn obtained the license for a casino on the Casino Parcel, Wynn would "make him whole" by providing him with his share of the $40 million windfall to Wynn (an amount equal to $18,676,000).

32. Mr. Gattineri asked Mr. DeSalvio to put Wynn's offer in writing. Mr. DeSalvio declined saying that Wynn, as a casino operator, is "more regulated than the nuclear power industry." Mr. DeSalvio, however, told Mr. Gattineri not to worry, that Wynn had many ways in which it could make Mr. Gattineri whole through other projects and developments.

33. Mr. Gattineri accepted the offer made by Mr. DeSalvio on behalf of Wynn to make him whole and Mr. Gattineri and Mr. DeSalvio shook hands on the agreement (the "San Diego Agreement").

34. Within hours of the San Diego Agreement, and after six months of refusing to sign the Certificate in the face of tremendous pressure and threats and his own legal concerns, Mr. Gattineri signed his Certificate and delivered it by overnight courier for presentation to the Gaming Commission.

35. Until the Certificate was delivered to the Gaming Commission, Mr. DeSalvio continued to stay in close contact with Mr. Gattineri to make sure it was accomplished as the two had agreed at the San Diego Meeting.

36. Before the Certificate even arrived at the Gaming Commission, Wynn had publically announced the resolution of The Gattineri Problem, i.e. that Mr. Gattineri had signed

the Certificate that the Gaming Commission had required from Wynn as part of its application for the casino license.

37. Only three months later, on September 16, 2014, the Gaming Commission awarded the casino license to Wynn for the Casino Parcel and Wynn purchased the Casino Parcel at the lowered price of $35 million, representing a temporary $40 million windfall to Wynn, subject to Wynn's San Diego Agreement to make Mr. Gattineri whole.

38. In October, 2014, Mr. Gattineri was arrested and charged in United States District Court with several crimes in connection with alleged improprieties in connection to the sale of the Casino Parcel from FBT to Wynn.  Mr. Gattineri was also charged in Massachusetts state court on related charges.

39. On January 2, 2015, Wynn purchased the Casino Parcel from FBT at the reduced price of $35 million (as agreed subject to the San Diego Agreement), representing a temporary $40 million windfall to Wynn.

40. In May, 2016, Mr. Gattineri was acquitted of all Federal charges.  All Massachusetts charges against Mr. Gattineri were subsequently dropped.

41. Mr. Gattineri has remained in contact with Mr. DeSalvio in person and through email (both to Mr. DeSalvio's Wynn business email address and his personal AOL email address) and text message correspondences.  At no time since the San Diego Agreement was reached at the San Diego Meeting has Mr. DeSalvio denied making the agreement on behalf of Wynn to make Mr. Gattineri whole on Wynn's purchase of the Casino Parcel.

42. Wynn has taken no steps to meet its obligations under the contract it made with Mr. Gattineri at the San Diego Meeting.

43. On April 11, 2018, counsel to Mr. Gattineri sent a letter to Wynn providing a written demand for relief pursuant to M.G.L. c. 93A, §9(3). On May 11, 2018, the deadline for any response, Wynn's counsel informed Mr. Gattineri's counsel that Wynn had chosen not to respond.

## COUNT I
### (Breach of Contract)
### (v. Wynn MA, LLC and Wynn Resorts, Limited)

44. Mr. Gattineri repeats and realleges all of the facts and allegations of Paragraphs 1 through 43 above as if set forth fully herein.

45. At the San Diego Meeting, Mr. DeSalvio, on behalf of Wynn, made the following offer to Mr. Gattineri: if Anthony Gattineri signed the required Certificate and Wynn obtained the casino license for a casino on the FBT Everett property, Wynn would "make Anthony Gattineri whole" by providing him with his percentage of the reduced purchase price, which is in the amount of $18,676,000.

46. Mr. Gattineri accepted Wynn's offer at the San Diego Meeting and Mr. Gattineri and Mr. DeSalvio shook hands on their agreement, forming a contract (the San Diego Agreement).

47. Within hours of the San Diego Agreement, Mr. Gattineri signed his Certificate and delivered it by overnight courier for presentation to the Gaming Commission.

48. On September 16, 2014, the Gaming Commission awarded the casino license to Wynn for the Casino Parcel and, on January 2, 2015, Wynn purchased the Casino Parcel at the lowered price of $35 million.

49. Wynn has refused to honor its contract, the San Diego Agreement, with Mr. Gattineri and intends to keep for itself the already received benefits of its contract with Mr. Gattineri.

50. Wynn has breached its contract with Mr. Gattineri by failing to make him whole by providing him with his 46.69% share of the $40 million price reduction windfall that Wynn received.

51. Mr. Gattineri has incurred damages of $18,676,000 plus statutory 12% per annum interest from and after January 2, 2015 and costs as a direct result of Wynn's breach of its contract with Mr. Gattineri.

Wherefore, Mr. Gattineri requests that this Court enter judgment in his favor against Defendants, Wynn MA, LLC and Wynn Resorts, Limited on Count I for breach of contract and award Mr. Gattineri damages of 18,676,000 plus statutory 12% per annum interest from and after January 2, 2015 and costs.

**COUNT II**
**Unfair and/or Deceptive Trade Practices in Violation of M.G.L. c. 93A**
**(v. Wynn MA, LLC and Wynn Resorts, Limited)**

52. Mr. Gattineri repeats and realleges all of the facts and allegations of Paragraphs 1 through 51 above as if set forth fully herein.

53. Defendants, Wynn MA, LLC and Wynn Resorts, Limited are engaged in business in the Commonwealth of Massachusetts and are registered to do business in the Commonwealth of Massachusetts.

54. By the acts and conduct set forth hereinabove, Wynn engaged in unfair and/or deceptive trade acts or practices by engineering, and then executing, a plan to intimidate, threaten and otherwise harass Mr. Gattineri until he signed the Certificate.

55. Despite the fact that he had done absolutely nothing wrong and had no legal obligation to sign the Certificate, Wynn threatened Mr. Gattineri with extreme economic consequences if he did not sign the Certificate.

56. Wynn threatened Mr. Gattineri with adverse publications in the media. Not long after such threats, multiple stories were published by various media outlets that were clearly adverse to Mr. Gattineri.

57. After the adverse publicity, Mr. Gattineri was subsequently indicted by Federal and Massachusetts authorities.  Mr. Gattineri was acquitted of all Federal charges and the Massachusetts charges were dropped.

58. Wynn also intimidated Mr. Gattineri by threatening to ruin him financially through the filing and prosecution of personal multi-million dollar civil lawsuits against him if he did not sign the Certificate.

59. Wynn's unfair and/or deceptive trade acts or practices occurred primarily and substantially within the Commonwealth of Massachusetts.  The threats made by Wynn to Mr. Gattineri were either made in person to Mr. Gattineri in meetings that took place in Massachusetts or on the telephone to Mr. Gattineri and/or his lawyers while he/they was/were located in Massachusetts from persons also, almost always, located in Massachusetts.

60. Mr. Gattineri has suffered substantial damages as a result of Wynn's unfair and/or deceptive trade acts or practices which were willful and knowing.

61. Mr. Gattineri is entitled to multiple damages and attorneys' fees as a result of Wynn's unfair and/or deceptive trade acts or practices.

62. On April 11, 2018, counsel to Mr. Gattineri sent a letter to Wynn providing a written demand for relief pursuant to M.G.L. c. 93A, §9(3). On May 11, 2018, the deadline for

any response, Wynn's counsel informed Mr. Gattineri's counsel that Wynn had chosen not to respond.

Wherefore, Mr. Gattineri requests that this Court enter judgment in his favor against Defendants, Wynn MA, LLC and Wynn Resorts, Limited on Count II for violation of M.G.L. c. 93A and award Mr. Gattineri triple damages of $56,010,000 plus attorneys' fees, interest at the statutory 12% per annum from and after January 2, 2015 and costs.

## COUNT III
### (Common Law Fraud)
### (v. Wynn MA, LLC and Wynn Resorts, Limited)

63. Mr. Gattineri repeats and realleges all of the facts and allegations of Paragraphs 1 through 62 above as if set forth fully herein.

64. Upon information and belief, when Wynn instructed Mr. DeSalvio to fly to San Diego to meet with Mr. Gattineri and authorized him to offer anything necessary and to make any agreement necessary to obtain Mr. Gattineri's signature, Wynn never had any intention of honoring any agreement that was reached with Mr. Gattineri and Wynn's only concern was getting Mr. Gattineri to sign the Certificate no matter what it took to accomplish that.

65. Upon information and belief, at the San Diego Meeting, Wynn, through Mr. DeSalvio, falsely represented to Mr. Gattineri that if Mr. Gattineri signed the Certificate, Wynn would make him whole on his loss of $18,676,000. At the time of Wynn's representations to Mr. Gattineri at the San Diego Meeting, upon information and belief, Wynn had no intention of honoring its obligation to Mr. Gattineri under the San Diego Agreement.

66. Upon information and belief, Wynn made a false representation to Mr. Gattineri and Wynn had knowledge of the falsity of its representation.

67.     Upon information and belief, the sole purpose of Wynn's false representation to Mr. Gattineri was to induce Mr. Gattineri to sign the Certificate that Wynn desperately needed to submit to the Gaming Commission as part of its casino license application.

68.     Mr. Gattineri relied on Wynn's representation as true and acted upon it by signing the Certificate after six months of prior, continuous refusals to do so in the face of threats, intimidation and legal concerns.

69.     Mr. Gattineri suffered damages of $18,676,000 as a result of Wynn's false representation upon which he relied.

Wherefore, Mr. Gattineri requests that this Court enter judgment in his favor against Defendants, Wynn MA, LLC and Wynn Resorts, Limited on Count III for common law fraud and award Mr. Gattineri damages of 18,676,000 plus interest at the statutory rate of 12% per annum from and after January 2, 2015 and costs.

**PLAINTIFF CLAIMS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

ANTHONY GATTINERI, Plaintiff

By his attorneys,

/s/ Stephen F. Gordon
Stephen F. Gordon (BBO No. 203600)
Todd B. Gordon (BBO No. 652482)
The Gordon Law Firm LLP
River Place
57 River Street
Wellesley, MA 02481
Tel:    (617) 261-0100
Fax:    (617) 261-0789
Email:  sgordon@gordonfirm.com
        tgordon@gordonfirm.com

Dated: June 12, 2018

P:\Clients-GLF\Gattineri, A (Wynn Casino)\Plead\Complaint.docx