# Exhibit 2

```
                                                           Page 1

 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF MASSACHUSETTS
 3    ANTHONY GATTINERI,
 4          Plaintiff,
 5       vs.                    Civil Action No. 1:18-cv-11229
 6    WYNN MA, LLC and WYNN RESORTS,
 7    LIMITED,
 8          Defendants.
 9    -------------------------------x
10    WYNN MA, LLC,
11          Plaintiff-in-Counterclaim,
12       vs.
13    ANTHONY GATTINERI,
14          Defendant-in-Counterclaim.
15    -------------------------------x
16
17               CONTINUED DEPOSITION OF
18                   ANTHONY GATTINERI
19                   CONDUCTED REMOTELY
20                Friday, October 23, 2020
21                     1:04 p.m. EDT
22
23               Laurie K. Langer, RPR
24
```

Page 33

1    team and they were getting it resolved.  I was confused
2    by the whole thing, probably as you are right now too.
3           It was a good price at 75 million, so I didn't
4    really know why any discount would happen.
5       Q.  Do you remember anything else that Mr. Weld said
6    at the meeting?
7       A.  I can't recall.  There was -- there was some
8    niceties.  He had met way back when he was running for
9    governor and invited me to be on his, a staff person to
10   promote businesses in Massachusetts.  So I think he
11   remembered that.  And I refreshed his memory about
12   meeting me in a restaurant, I'm trying to think of
13   which -- it wasn't Salvucci.  It was -- I'm trying to
14   think who the lieutenant governor was.
15      Q.  Cellucci?
16      A.  Cellucci.  Sorry.  My memory is a little gone
17   there.  Yeah, Cellucci.  And I was with some other
18   friends.  And I needed to remind him of a very
19   derogatory remark he made to me then.  And I think he
20   was surprised that I'm the same guy.  That was that part
21   of that.  Then he just made some other comments about, I
22   don't know, native Americans or stuff.  I don't know.
23   It was just -- I was pretty much done at that meeting.
24      Q.  Do you remember anything else that Mr. DeSalvio

1     A.  I may have wrote things down right after or, or
2  e-mailed, I don't recall from here.  I would have to
3  look at the....
4     Q.  Have you seen any -- have you seen any notes that
5  you took either at the meeting or immediately
6  thereafter?
7     A.  I don't recall.
8     Q.  What did -- what do you recall Mr. DeSalvio
9  saying at the meeting?
10     A.  If he was -- he was interested in finding out
11  what it was going to take to get the Gaming Commission
12  certificate signed.
13     Q.  Do you remember anything else he said?
14     A.  Of course I replied, I replied what it was going
15  to take.  The same thing that I had been replying since
16  April and all the other meetings.
17     Q.  What did you say?
18     A.  To be made whole.
19     Q.  Did you say anything other than, "I need to be
20  made whole"?
21     A.  I don't know if there was any other -- I think he
22  maybe mentioned something about the newspaper or doing
23  PR, or PR relations, or something like that.
24     Q.  Do you recall anything else you or he said?

Page 67

1    A.   Yeah, I told him my general, what my general
2    concerns for the environment, the river clean up, you
3    know, stuff that's important to me at a personal level.
4    Q.   I'm sorry.  Mr. Gattineri, could you repeat that,
5    I just couldn't hear that.
6    A.   Yeah, we had discussions about maybe the cleanup
7    process over there where the riverfront, that six acres
8    in the front being cleaned up, how that was going to
9    take place.  That was -- that was important to me
10   because Wynn had to withdraw, you know, the ability to
11   clean up whatever that finding that Judge Gordon had on
12   the river in terms of making it cleaned out.
13        That was -- you know, I was there to make sure
14   I'm going to get my money, but also making sure that
15   Wynn was going to live up to their commitment of
16   cleaning up the river, you know, that made -- that was
17   important.  That was pretty important to me.  We
18   probably talked about golf or whatever else, I don't
19   know.
20   Q.   Do you remember either one of you saying anything
21   else about you wanting to be made whole?
22   A.   Yeah, I already mentioned that, that I want to be
23   made whole.
24   Q.   But other than that, that's all you said, to be

1    made whole?
2         A.   Sure.  The money -- I was there for the money.
3    The big issue, you know.  And it didn't appear, it
4    didn't appear to be an issue.  I mean, he had the
5    ability to get that done.  Me, I am meeting with the
6    president there, right, so I felt pretty comfortable
7    with that.
8         Q.   Any -- anything else regarding any of the details
9    on how you would be made whole?
10        A.   No, I just think -- no, I was pretty satisfied
11   that, you know, Bob had mentioned that, you know,
12   because they're so, they're so regulated that the Wynn
13   group, they know how to do this stuff, they're the
14   professionals, they've done this before.  This is not
15   their first in-fill site or stuff like that where they
16   dealt with this stuff.
17             And, you know, because they are, because they're
18   under scrutiny they have the people to make sure they do
19   things right.  And I was pretty satisfied that, you
20   know, they were going to do things right, so.
21   That's -- I felt okay with this whole thing.
22        Q.   That was the extent of the conversation?
23        A.   I'm trying to -- I mean, he had the authority to
24   do it, you know.  It was almost -- it was almost too

1  casual.  You know, he wouldn't put, he wouldn't put it
2  in writing.  I knew that.  And he said, "it won't matter
3  because we have to do everything right and we have the
4  people that will do that.  They're under scrutiny by the
5  Gaming Commission."
6         And I said, "hey, I'm not, I'm not a lawyer, I'm
7  just a, I'm the guy that packed oil and cans for a
8  living, so.  This is my first go around doing business
9  with high level people that are, have staffs of people
10 that work with them that do this stuff for them."
11        That was basically -- I was -- I felt pretty
12 comfortable that the deal was struck and the casino
13 project finishes, and as it gets done I'm going to be
14 getting my money, my percentage.  I was very comfortable
15 leaving there.  I just needed to speak with my wife to
16 make sure that she was comfortable with that too.
17    Q.  Did you tell Mr. DeSalvio that two days earlier
18 you had paid Charlie Lightbody off on the note?
19    A.  I don't believe I told him that.
20    Q.  Did you tell him?
21    A.  I don't know.  I don't know if I told him that.
22 I think that was confidential information.
23    Q.  Did you tell him?
24    A.  I don't know.  I don't want to guess.  I don't

1   recall.
2       Q.  Did you tell him that on Friday, June 13th, the
3   day before you met, that Mr. Bailey had spoken with
4   Karen Wells about your certificate?
5       A.  I would have no idea.
6       Q.  You had no idea if you told him that?
7       A.  No idea.
8       Q.  Do you remember anything else about the meeting?
9       A.  Just that maybe he was going to meet me the
10  following day, which was Sunday, I think it was like
11  Father's Day weekend.  I was going to see if he wanted
12  to, you know, get together and talk about the
13  environment and that stuff, and see where they might be
14  going with that, what their plans are.  I had some
15  suggestions for them.
16      Q.  What did you do after the meeting ended?
17      A.  I went downstairs at the parking garage to find
18  my car.  He came down with me.  You know, I, I think
19  actually he gave me a big hug and said, "this is great,
20  we're moving forward."
21          I said, "okay, we're good."  I said, "I'm going
22  to go check with my wife."  And, you know, I want to get
23  her opinion on this because I would always do that no
24  matter what.  I would keep her in the loop of

1  can't see it clearly.  The reproduction is very poor
2  quality.
3      Q.  Do you believe it to be, this to be a copy of the
4  certificate that you signed in San Diego on June 14th in
5  2014 which was then notarized by someone, and I'll spell
6  the last name, M-A-H-M-O-U-D-I, in San Diego County?  Do
7  you believe this is your certificate?
8      A.  Yes.
9      Q.  Where did you have this notarized?
10     A.  I had it notarized at a UPS store in Del Mar.
11     Q.  After the certificate was delivered to the Gaming
12 Commission on June 18th, 2014, when was the next time
13 you had any communication with anybody from Wynn?
14     A.  The certificate, I just want to be clear, the
15 certificate was sent to Brad Bailey's office.  And I had
16 one of my employees go to Brad Bailey's office and pick
17 it up and hand deliver it to Catherine Blue.  And I mean
18 hand deliver it.  So I don't know if this went to
19 Catherine Blue too.  She must have two of them, I have
20 no idea.
21     Q.  That's very helpful.  I appreciate that.
22     A.  You asked me for information, I'm trying to help.
23     Q.  Can you try to answer my question.  Do you need
24 me to ask it again?

Page 94

1    A.   Ask again.
2    Q.   Sure.  After the certificate was delivered to the
3    Gaming Commission when was the next time you had any
4    communication with anyone from Wynn?
5    A.   I don't recall, Mr. Starr.  I don't recall.
6    Q.   You were indicted in the fall of 2014 and
7    ultimately your trial was in or about April or May of
8    2016, was the next time that you had any communication
9    with anybody from Wynn after the end of your trial in
10   the spring of 2016?
11   A.   No.  Actually, I think I met Bob DeSalvio and his
12   wife in August or September of 2014.
13   Q.   Where did you meet them?
14   A.   (Inaudible.)
15   Q.   Pardon me?
16   A.   I met them at Winchester Country Club.  Actually,
17   he met me there.  I'm the member.
18   Q.   Did you invite him for dinner or did you just
19   happen to run into him?
20   A.   No, he was invited by the president of the
21   country club somehow someway through a friend of his who
22   were in the casino in Pennsylvania, something like that.
23   Bob introduced him.  He was there without me somehow.
24   Q.   In August of 2014 that was the next time that you

1    A.   I understand.

2    Q.   So --

3    A.   I'm not a rude person, so.

4    Q.   I understand, okay.  Thank you.

5    A.   I'm sorry.

6    Q.   I had asked you about when was the next time you
7    had any communication with anyone from Wynn after
8    June 18th of 2014 and you, you, your last few answers
9    have dealt with Mr. DeSalvio.
10        Other than the communication with Mr. DeSalvio
11   that you identified in August or September of 2014, did
12   you have any communication with anybody else from Wynn
13   after June 18th of 2014 until the time you reached out
14   to Mr. DeSalvio after your nolle pros in 2016?
15   A.   I believe I texted him or called him and, or, you
16   know, I'm trying to get it straight, or I just went
17   right over to the casino and I brought a note that said,
18   "Anthony, San Diego," I wanted to make sure that he knew
19   who I was.
20   Q.   Mr. Gattineri, I apologize again for cutting you
21   off.  My question to you, Mr. Gattineri, was not with
22   respect to DeSalvio.  As you've just told us, that was
23   your next contact with DeSalvio is sometime in 2016.
24        Anybody else from Wynn?  Did you have any

Page 102

1  communication with them from June 18th of 2014 up until
2  the time that you next were in touch in 2016 with
3  Mr. DeSalvio, do you remember any other communication
4  with anybody else from Wynn?
5      A.  The only other one is when I went on nolle pros,
6  Bob wasn't there.  I asked for an employee who I was
7  familiar with.  I'm trying to think of the name.  Just
8  bear with me a little bit.  Oh, I know, I know.  He was
9  the former FBI agent on the Wynn case investigating me
10 and he was now the security person at Wynn.
11         So I asked for him so I could meet him because he
12 lives in Winchester and I wanted to just ask him if he
13 could find Bob for me.  He was left a message with
14 someone there, I don't know the girl's name.
15     Q.  That was in 2016 after the Federal Court trial --
16     A.  Yes.
17     Q.  -- and after the nolle pros?
18     A.  Yes.  And I think it was one employee, I'm not
19 sure.  That sort of thing.
20     Q.  So other than -- other than the communication at
21 the Winchester Country Club with Mr. DeSalvio when you
22 ran into him there in August or September of 2014, is my
23 understanding of your testimony correct that from
24 June 18th of 2014 until the time in 2016 after the

1  Federal Court trial and after the nolle pros when you
2  went over to the facility to find Mr. DeSalvio, you had
3  no communication with anybody else from Wynn during that
4  approximately two-year period?
5      A.  No.  I said I met with the Wynn head of security,
6  FBI Agent Carazza.
7      Q.  You said that was after the nolle pros.
8      A.  I don't recall.  This is way too confusing for
9  me.  I'm sorry.  I'm doing the best I can.  So my answer
10 is I don't recall.
11     Q.  Turn to Tab A -- turn to Tab V in your binder.  V
12 in your binder, V as in Victor.  This will be
13 Exhibit 92.
14          (Deposition Exhibit No. 92 marked for
15 identification.)
16     Q.  Gattineri-Wynn 08 -- pardon me.  008117 through
17 008119.
18     A.  Uh-huh.
19     Q.  Is this an e-mail that you sent to your wife Lisa
20 and your daughter Michelle on June 24th of 2014?
21     A.  Yes.
22     Q.  And if you would turn to Exhibit W, please.
23     A.  Do you want me to read this one, or?
24     Q.  Go to Exhibit W.  You've answered my question.

EXHIBIT 0092

# V

| | |
|---|---|
| Message | |
| From: | Ag [agattineri@gmail.com] |
| Sent: | 6/24/2014 11:40:01 AM |
| To: | LISA GATTINERI [lisagatt_2000@yahoo.com]; Michelle Gattineri [mgattineri@gmail.com] |
| Subject: | Fwd: SJC rules casino repeal question can be put on ballot |

Wow
That is why I did not want to sign anything because if it gets repealed then it was all for nothing
Lawsuits will fly from everywhere
Businesses will run from Massachusetts big time

# SJC rules casino repeal question can be put on ballot

Massachusetts' highest court this morning cleared the way for a repeal of the state casino law to appear on the November ballot, setting up a fierce referendum campaign for the fall and placing the fate of the state's nascent gambling industry into the hands of the people.

The Supreme Judicial Court, in a unanimous decision, ruled that Attorney General Martha Coakley made a mistake last year when she rejected the anticasino ballot question.

Continue reading

"We conclude that the Attorney General erred in declining to certify, and grant the requested relief so that the initiative may be decided by the voters at the November election," the court said in a 55-page decision written by Justice Ralph Gants.

The casino repeal campaign this summer and fall is expected to draw significant national interest — and money.

"This is going to be a multimillion-dollar campaign, no doubt about it," said Springfield political strategist Anthony Cignoli, who has closely followed the development of the state's casino industry.

**RELATED: After initial fanfare, skepticism on casinos grows**

For passionate casino opponents across the United States, the Massachusetts repeal referendum presents a tantalizing opportunity to defeat an industry that has steamrolled opposition for years, spreading into 39 states.

"This is a very historic ballot question," said Les Bernal, director of the national anticasino group, Stop Predatory Gambling, in a recent interview. "It will be the first time in modern history for a citizen-led effort to repeal government sponsorship of casinos" to be decided by voters.

Continue reading below

The group will encourage its supporters to help fund the anticasino campaign in Massachusetts, he said.

The head of the Massachusetts repeal effort, John Ribeiro, hailed the ruling as "the firing of the starting gun in this incredibly important campaign."

"We know Massachusetts can do better than this casino mess," said Ribeiro, head of Repeal the Casino Deal. "We're elated at the opportunity to continue sharing the truth about casinos and the harm they would bring to our communities."

For the applicants pursuing casinos in Massachusetts, the SJC ruling puts roughly $1.7 billion a year in projected gambling revenue at risk. The companies are expected to spend heavily to protect their access to the emerging Massachusetts market.

"We remain confident that Massachusetts voters will want to protect the thousands of new jobs and the hundreds of millions in annual tax revenues that our new industry will generate, in addition to recapturing over $1 billion being wagered by Mass. residents in neighboring states each year," said Eric Schippers, a senior vice president for Penn National Gaming, in a statement this morning.

Penn in February won won the state's sole slot parlor license. The construction project is already underway at Plainridge Racecourse, in Plainville.

Penn has promised to run a campaign to defend the law.

"Our fight to protect jobs and preserve this economic development opportunity for Massachusetts begins today," Schippers said. "Construction on the Plainridge Park Casino remains full steam ahead and we continue to anticipate a June 2015 opening."

A Boston Globe poll this month found that opinions are divided over the casino law. Fifty-two percent of likely voters want to keep the law, while 41 percent favor repeal.

Other surveys suggest opponents start in a stronger position.

A Suffolk University poll in early June found that only 37 percent approved of casinos here.

"I think the campaign will matter a lot," said Clyde Barrow, a University of Massachusetts-Dartmouth casino expert. "I don't think it's a foregone conclusion for either side."

The Repeal the Deal group has in recent weeks begun to transform itself into a political campaign aimed at persuading people to ban the casino industry from Massachusetts. The group in early June hired a campaign manager and an experienced political fundraiser.

Opponents will seek to knit together a number of anti-casino citizens groups that cropped up in 2012 and 2013 to fight individual casino proposals in cities and towns across the state. Several of these local groups managed to beat the industry, despite being massively outspent by gambling proponents. Casino opponents in West Springfield, Palmer, East Boston, and Milford defeated casino proposals at the ballot box; opponents won by default in Millbury, when an applicant dropped a slot parlor proposal ahead of a scheduled vote due to local opposition. Casino opponents in other towns, such as Foxborough, Boxborough, and Tewksbury, blocked gambling proposals before they could make it to the ballot.

Nathan Bech, a leader of an opposition group in West Springfield that defeated a Hard Rock casino proposal, said opponents are still motivated to fight the industry, even though many no longer face casino proposals in their hometowns.

"The groups have never stopped," Bech said in a recent interview. "The West Springfield group, the Palmer group and the No Casino Springfield group have continued to work together" on the repeal effort.

The anti-casino coalition will also likely include religious leaders and public officials who actively oppose the industry, including Somerville Mayor Joseph Curtatone.

"I'll be out there fighting, advocating and participating at the grass-roots level," Curtatone said in an interview before the SJC decision.

On the other side, the pro-casino effort will include municipal officials who have embraced the industry for the jobs and revenue it promises to provide. These officials include Springfield Mayor Domenic Sarno, Revere Mayor Dan Rizzo and Everett Mayor Carlo DeMaria. The pro-casino coalition will likely also include potential employees of the industry and labor unions eager for the construction jobs.

In addition to authorizing a slot parlor, the 2011 state casino law created three resort casino licenses, which have not yet been issued.

The state gambling commission in June chose an MGM Resorts proposal in Springfield as the winner of the Western Massachusetts casino resort license, but did not formally award the license due to MGM's concerns about the repeal effort. The company did not want to be on the hook for some $200 million in obligations that will be triggered when the gambling commission officially grants the license.

Gattineri-Wynn – 008118

The sweepstakes for the Boston-area license is between two rival projects: a Wynn Resorts proposal in Everett and a Mohegan Sun casino plan at Suffolk Downs in Revere. State regulators plan to choose the winner later this summer.

The resort license created for Southeastern Massachusetts is scheduled to be awarded in 2015. Casino projects have been proposed in Fall River and New Bedford.

Boston University journalism professor Fred Bayles, who studies referendums, said the pro-casino side begins with the advantage that most voters do not live in the handful of municipalities where casinos are planned.

"The direct impact is limited to a couple communities that have already voted in favor of it," Bayles said.

As always, money will play a large role in the campaign, and casino backers probably will outspend opponents. But in this case money alone may not guarantee a victory.

"Gaming referenda are one of the few things where the amount you spend is not necessarily the determining factor in who wins," said Barrow. "I don't think this is the kind of referendum where the gaming industry can just win it with money. They have to build a grass-roots coalition."

Cignoli, the Springfield strategist, said opponents also have more ammunition for a campaign than they did three years ago, when state lawmakers and Governor Deval Patrick legalized Las Vegas-style casino gambling and created a five-member commission to regulate it. The long rollout of the industry in Massachusetts has been marred by delays, lawsuits, failed local referendums, sniping between supporters of rival projects, and accusations of bias against the state gambling commission.

"Even the governor who put the idea of casinos forward has since said he would not want one in his town," Cignoli said. "I do see energy on the part of the opponents."

The SJC ruling rejected Coakley's argument that the repeal was an illegal "taking" of contract rights from casino applicants.

"The possibility of abolition is one of the many foreseeable risks that casinos, slot parlors and their investors take when the choose to apply for a license," the court wrote.

Coakley, a Democrat who is leading in polling in the governor's race, issued a statement, saying, "I am pleased that the SJC has ruled on this matter, and it is now an issue that will be decided by the voters in the fall. My office had conducted a legal review of this ballot question, but knew it would ultimately be decided by the Court. My office worked cooperatively with both parties to put this issue before the Court. Now, with today's decision, voters will have the final say."


Sent from my iPhone

In accordance with Internal Revenue Service Circular 230, we hereby advise you that if this E-mail or any attachment hereto contains any tax advice, such tax advice was not intended or written to be used, and it cannot be used, by any taxpayer for the purpose of avoiding penalties that may be imposed on the taxpayer by the Internal Revenue Service.

This E-Mail may contain information that is privileged, confidential and / or exempt from discovery or disclosure under applicable law. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege. If you are not the intended recipient of this communication, and have received it in error, please do not distribute it and notify me immediately by E-mail at wsullivan@preti.com or via telephone at 207.791.3000 and delete the original message. Unless expressly stated in this e-mail, nothing in this message or any attachment should be construed as a digital or electronic signature or as a legal opinion.

Gattineri-Wynn – 008119