## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| ANTHONY GATTINERI, | ) |
| | ) |
|      Plaintiff and | ) |
|      Counterclaim-Defendant, | )      Civil Action No. |
| | )      18-11229-FDS |
|      v. | ) |
| | ) |
| WYNN MA, LLC, | ) |
| | ) |
|      Defendant and | ) |
|      Counterclaim-Plaintiff, | ) |
| | ) |
|      and | ) |
| | ) |
| WYNN RESORTS, LIMITED, | ) |
| | ) |
|      Defendant. | ) |

_____)

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO STRIKE

SAYLOR, C.J.

### I.    Background

Plaintiff Anthony Gattineri brought this action against defendants Wynn MA, LLC ("Encore") and Wynn Resorts, Limited ("Wynn"). The complaint alleges three claims arising out of an alleged Option Agreement between FBT Everett Realty, LLC, of which Gattineri is a member, and Encore. The Option Agreement concerned the potential purchase of land in Everett by Encore from FBT that is now the site of the Encore Boston Harbor casino.

Defendants have moved for summary judgment on all counts. As part of his response to that motion, Gattineri filed an affidavit attesting to certain facts. Defendants have moved to strike portions of the affidavit. For the following reasons, the motion will be denied.

II.  **Motions to Strike**

Generally speaking, only evidence that would be admissible at trial may be considered in connection with a motion for summary judgment.  *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-50 (1st Cir. 1990).  A significant exception is affidavits; under Fed. R. Civ. P. 56, affidavits, although not themselves admissible at trial, may be offered in support of, or opposition to, summary judgment if they set forth facts that would be admissible under the Federal Rules of Evidence.  *See id.* at 49.  Pursuant to Fed. R. Civ. P. 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

Summary judgment affidavits are subject to the "sham affidavit" rule.  "When an interested witness has given clear answers to unambiguous questions [in a deposition], he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."  *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994); *see also Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 20 (1st Cir. 2000); 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY ALLEN, FEDERAL PRACTICE & PROCEDURE § 2726.1 (4th ed. 2016).  The "sham affidavit" rule safeguards the integrity of summary judgment proceedings by preventing a party from "manufactur[ing] a dispute of fact by contradicting his earlier sworn testimony without a satisfactory explanation of why the testimony is changed."  *Abreu-Guzman v. Ford*, 241 F.3d 69, 74 (1st Cir. 2001).  The "sham affidavit" rule does not apply if there is a "satisfactory explanation" as to a contradiction between deposition testimony and an affidavit, because "lapse of memory, new sources of information or other events can often explain a revision of testimony."  *Hernandez-Loring v. Universidad Metropolitana*, 233 F.3d 49, 54 (1st Cir. 2000);

*see Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995) ("Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.").  Whether there is such a clear contradiction and whether an explanation for it is satisfactory are highly dependent on a fact-intensive assessment made by the court. *Hernandez-Loring*, 233 F.3d at 54.  Evidence in the record, beyond the deposition testimony and affidavit at issue, may provide support to an explanation of a contradiction.  *See Torres*, 219 F.3d at 21; *Stewart v. Rise, Inc.*, 791 F.3d 849, 861 (8th Cir. 2015).

A motion to strike is the proper vehicle for challenging the admissibility of evidence offered at the summary judgment stage.  *See Casas Office Machs., Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 682 (1st Cir. 1994).  "The moving party must specify the objectionable portions of the affidavit and the specific grounds for objection.  Furthermore, a court will disregard only those portions of an affidavit that are inadmissible and consider the rest of it."  *Id.* (citation omitted); *see also Perez v. Volvo Car Corp.*, 247 F.3d 303, 315-16 (1st Cir. 2001).

## III.  Analysis

Defendants have moved to strike portions of Gattineri's affidavit on the ground that they contradict his deposition testimony.  Specifically, defendants argue that his deposition testimony contradicts (1) certain portions of paragraph 11, (2) the first sentence of paragraph 22, and (3) all of paragraph 26 of the affidavit.

### A.  Paragraph 11

Defendants seek to strike the italicized portions of paragraph 11(a) of Gattineri's affidavit reproduced below:

On April 14, 2014, I met with Mr. DeSalvio (along with Steve Tocco) for the first

> time, and *Mr. DeSalvio informed me that he was to become the President of Wynn's Boston Casino if Wynn were to be awarded the casino license.  Mr. DeSalvio also informed me that he had been tasked with ensuring that I provide a signed Certificate so that Wynn could receive the casino license.  I emailed Mr. DeSalvio later that evening and expressed my interest in coming to an agreement on my desire to be made whole on my percentage of the price reduction.*

(Gattineri Aff. ¶11) (emphasis added).

At his deposition, on February 24, 2020, Gattineri testified that "[DeSalvio is] president of the company - - or will be the president of the company as soon as they received [sic] the license."  (Gattineri Dep. Tr. I:114).  According to defendants, the following exchange in that deposition contradicts the affidavit:

> Q.  And did Mr. DeSalvio introduce himself to you at that meeting [on April 14, 2014]?
>
> A.  Yes.
>
> Q.  And what did he say about himself when he introduced himself?
>
> A.  He said he's the person that's going to be running the casino.  He's going to be in charge of the casino.
>
> Q.  If they get the license?
>
> A.  If they get the license.

(*Id.* at 297).

The affidavit does not clearly contradict the deposition testimony.  *Cf. Colantuoni*, 44 F.3d at 4-5.  "[T]he President" and "the person that's going to be running the casino" are not in obvious conflict.  Indeed, earlier in his deposition, Gattineri expressly noted that DeSalvio was to become the "president."  He also referred to the license contingency in both his affidavit and his deposition testimony.  Accordingly, the second clause of the first sentence of paragraph 11(a) will not be struck.

The second sentence of paragraph 11(a) states, "Mr. DeSalvio also informed me that he

4

had been tasked with ensuring that I provide a signed Certificate so that Wynn could receive the casino license." Gattineri's deposition testimony does not contradict that sentence. He did not testify as to whether he was informed that DeSalvio was allegedly tasked with getting him to sign the certificate. And counsel did not ask an unambiguous question regarding whether Gattineri knew or was informed that DeSalvio was tasked with ensuring he signed the certificate. (Gattineri Dep. Tr. I: 296-301).[1] Accordingly, the second sentence of paragraph 11(a) will not be struck.

The third sentence of paragraph 11(a) states, "I emailed Mr. DeSalvio later that evening and expressed my interest in coming to an agreement on my desire to be made whole on my percentage of the price reduction." In his deposition, Gattineri testified as follows:

> Q. Exhibit 69 is Bates-stamped Gattineri-Wynn 001024 to 10841. The first document, sir, do you recognize that as your email to Mr. DeSalvio –
>
> A. Yes.
>
> Q. -- the evening of April 14th?
>
> A. Yes.
>
> Q. And then attached to it is a copy of your email and Mr. DeSalvio's response

---

[1] Furthermore, DeSalvio himself testified as follows:

> A. When I joined the company and was told about the need to have the affidavit signed, they gave me the names of three individuals. They had mentioned that two of the three had already signed, and they suggested that I meet with all of the owners. In particular, I believe Kim suggested that I meet with Paul Lohnes and Dustin DeNunzio first and that maybe they'd be able to provide information as to why Mr. Gattineri wasn't able to the sign the affidavit.

(DeSalvio Dep. Tr. 109-10).

> Q. The only thing – was there anything required from Mr. Gattineri other than signing the affidavit?
>
> A. To my knowledge, no. The only thing I'd asked him to do was sign the affidavit so we could move forward with the closing of the property.

(*Id.* 116).

later that evening.  "Sounds good. Thanks for the update. Bob"?

A.  Yes.

--

Q.  And you said [in your email], "Let's make a strong effort so we can do this before Easter," right?

A.  Okay.

Q.  Strong effort to do what?

A.  To meet to discuss the land, the pricing of the land and all that.

(Gattineri Dep. Tr. I:302-03).  He later testified as follows:

Q.  What did – what do you recall Mr. DeSalvio saying at the meeting?

A.  If he was – he was interested in finding out what it was going to take to get the Gaming Commission certificate signed.

Q.  Do you remember anything else he said?

A.  Of course I replied, I replied what it was going to take.  The same thing that I had been replying since April and all the other meetings.

Q.  What did you say?

A.  To be made whole.

(Gattineri Dep. Tr. II:66).

Again, the affidavit does not clearly contradict the deposition testimony.  Gattineri

testified that he e-mailed Mr. DeSalvio the evening of April 14 concerning a meeting to discuss

the pricing of the land.  Although he did not specifically mention his "desire to be made whole

on [his] percentage of the price reduction," counsel did not ask him an unambiguous question as

to what he meant by "the pricing of the land and all that."  (Gattineri Dep. Tr. I:302-04).

Furthermore, his later testimony that at the June 14 meeting he expressed to DeSalvio "[t]he

same thing that [he] had been replying since April and all the other meetings"—his desire to "be

6

made whole"—lends support to his statement in paragraph 11(a) of his affidavit.  Accordingly, the third sentence of paragraph 11(a) will not be struck.

Paragraph 11(b) of the affidavit states, "On April 15, 2014, Mr. DeSalvio called me to discuss the Certificate and my share of the $40 million price reduction."  (Gattineri Aff. ¶11).  In his deposition, Gattineri testified as follows:

> Q.  Okay, the next note he has is from April 15th.  "I called Mr. Gattineri to let him
> know the Globe is doing a story about the land deal in Everett and will consider
> using eminent domain to take the land."  Do you see that?
>
> A.  Yes.
>
> Q.  Do you recall receiving that phone call from Bob?
>
> A.  I don't recall it.

(Gattineri Dep. Tr. I:304).  It is true that the affidavit discusses a phone call that during his deposition Gattineri stated he did not recall.  He attributes the discrepancy to a lapse of memory.  He further notes that the lapse occurred during the last ten minutes of a seven-hour deposition.  He also testified that "[i]t's getting so late that I'm not even going to function to recall, because it's too much."  (*Id.* at 310).  Under the circumstances, he has provided a sufficiently satisfactory explanation for the discrepancy to avoid the application of the sham-affidavit rule.  *See Hernandez-Loring*, 233 F.3d at 54.  Accordingly, paragraph 11(b) will not be struck.

Paragraph 11(c) of the affidavit states, "On April 17, 2014, Mr. DeSalvio called me to confirm a meeting for April 18, 2014."  (Gattineri Aff. ¶11).  In his deposition, Gattineri testified as follows:

> Q.  Do you recall, Mr. Gattineri, that Mr. DeSalvio called you on the 17th to ask
> if the meeting on the 18th was on and to find out where the location was?  Do
> you recall that?
>
> A.  I don't.  We met at Doherty's office.

(Gattineri Dep. Tr. I:305).  Again, Gattineri attributes that discrepancy to a lapse of memory and again notes that the lapse occurred during the last ten minutes of a seven-hour deposition.  In his later deposition, when questioned about a specific phone call with DeSalvio, he stated: "I spoke with him several times.  I don't recall the dates."  (Gattineri Dep. Tr. II:28).  That further supports his claim of a lapse of memory.  *See Hernandez-Loring*, 233 F.3d at 54.  Again, under the circumstances, he has provided a sufficiently satisfactory explanation for the discrepancy to avoid the application of the sham-affidavit rule.  *Id.*  Accordingly, paragraph 11(c) will not be struck.

Defendants also seek to strike certain portions of paragraph 11(g), italicized below:

> On June 6, 2014, I met with Mr. DeSalvio, Mr. Tocco, Governor Weld, and Attorney Doherty at the Hawthorne Hotel in Salem, Massachusetts, and discussed the Certificate and my share of the $40 million price reduction.  At that meeting, Mr. DeSalvio threatened me by saying "Nothing stands in our way."  Mr. Tocco threatened me by saying "We control the media."  *In addition, Governor Weld threatened me by saying that I would be sued if I didn't sign the Certificate and that, if I didn't sign, the City of Everett would take the FBT Parcel by eminent domain for only $15 Million.*  Despite these threats, I refused to sign any Certificate unless I was made whole on my percentage of the $40 Million price reduction.

(Gattineri Aff. ¶11) (emphasis added).

In his deposition, Gattineri testified as follows:

Q.  Was this the -- strike that. Was the meeting at the Project Triangle a time when Mr. Tocco threatened you with dire economic consequences?

A.  I don't recall if it was that meeting or all of them.  It was -- it was ongoing. There was meetings that seemed to be all about the same thing.

Q.  What do you mean by that?

A.  The meetings -- they wanted to keep meeting with me.

Q.  It was their idea to meet with you?

A.  Yeah, it was their idea.  They wanted to meet to sign the confirmation.

Q.  And you mentioned something about eminent domain?

A.  Eminent domain, to the best of my knowledge, came up at the Hawthorne.

Q.  And what does that mean in connection with the property, eminent domain?

A.  Well, they had said they met with the mayor and they -- and the mayor and Wynn said they're just -- if I don't sign this confirmation, they're going to just take the property [by] eminent domain and basically give me almost nothing for it.  They basically said you get nothing for it.

Q.  Who was going to do the eminent domain?

A.  I don't know.  I'm meeting with Wynn people.  I have no idea.  I don't know if Bill Weld is with Wynn.  I don't know if he's with Mintz Levin.  I don't know who's with who.

Q.  Do you know what eminent domain is?

A.  Eminent domain, I believe, is when a town can take your property for the best interests of the community.

Q.  And in this case, that's Everett?

A.  Everett and Boston, I guess. It's in two pieces.

(Gattineri Dep. Tr. I:44-45).

Q.  Who threatened to ruin you "financially through the filing and prosecution of personal multimillion dollar civil lawsuits"?

A.  It was a group of them.  It was Bill Weld, Steve Tocco and Bob DeSalvio at The Hawthorne Hotel in Salem.

Q.  At the Hawthorne?

A.  Yeah.

(*Id.* at 95).

Paragraph 11(g) of the affidavit does not clearly contradict the deposition testimony.

Gattineri testified that Governor Weld was among those who threatened him and expressly

mentioned Weld when asked about eminent domain.  The differences between paragraph 11(g)

of his affidavit and his deposition testimony do not rise to the level of a direct contradiction.  *Id.*

Accordingly, paragraph 11(g) will not be struck.

Defendants also seek to strike paragraph 11(j), which states as follows:

> When we made the San Diego Agreement, I took out my iPhone and played a two
> minute YouTube video for Mr. DeSalvio of a scientific experiment with two
> Capuchin monkeys physically separated with a small hole in the plexiglass
> separating them.  One had on its side a closed container of nuts.  The other had on
> its side a rock that could be used to open the container.  Neither monkey had access
> to the food on its own.  The monkey with the tool trusts the monkey with the food
> container and puts the tool through the opening.  The monkey uses the tool to open
> the container and takes out the nuts inside.  And promptly gives the monkey who
> had the tool a fair share of the nuts through the same small hole (the video is still
> readily available on YouTube, titled "Monkey cooperation and fairness" and has
> been viewed over 340,000 times).  I told Mr. DeSalvio that I was trusting him.  He
> said he understood and we shook hands on our Agreement.

(Gattineri Aff. ¶11).  That detail of Gattineri showing the video and then shaking hands with

DeSalvio on an agreement was not mentioned during his deposition, but it does not clearly

contradict anything in his testimony.  Defendants' counsel did not ask Gattineri unambiguous

questions to establish whether anything else was discussed at the San Diego meeting.  The issue

appears to be one of credibility, which is best left to the jury.  Accordingly, paragraph 11(j) will

not be struck.

**B.    Paragraph 22**

Defendants seek to strike the first sentence of paragraph 22 of the affidavit, which states,

"My innocence was not a condition to the San Diego Agreement, nor was it discussed at the San

Diego Meeting."  (Gattineri Aff. ¶22).  In his deposition, he testified as follows:

Q.  Why didn't you make a demand on January 3rd of 2015, for your $18,676,000?

A.  I didn't think it was necessary.

Q.  You didn't think it was necessary to request payment of $18,676,000?

A.  No, it was impossible.

Q.  What do you mean "it was impossible"?

A.  I was not – I was under indictment.

Q.  Why did your being under indictment make it impossible?

A.  Because the Gaming Commission, from what I, at least believed to be the Gaming Commission, had come up with a plan with Bill Weld to cut the price down, and under the statutory law or whatever it's called, somehow it got invented that if you sold a piece of land and you are a criminal or criminally charged or in any way, that you can't profit from a casino premium.  That's what this belief was all about.  So Wynn had to wait and I had to wait for my money until I absolutely was exonerated and cleared from everything, and that's exactly what I did.

Q.  That was one of the conditions of the deal?

A.  Yeah, I told Bob, "You'll find out I did nothing wrong. When I'm fully cleared, you'll make me whole."  And that was it.

Q.  So that was a condition of the deal, too, that you had to get cleared?

A.  Well, I don't know if it was a condition of Wynn or it's a condition of the Gaming Commission and Weld.  It's all one group at this point.

Q.  Well, I want to know about your agreement with Bob.

A.  My agreement –

Q.   -- it was part of your agreement with Bob –

A.  Yep.

Q.  -- that the money would only be owed it you got cleared?

A.  The amount over -- the amount between the reduced price and the casino premium, that delta, would be paid if there was no claims against me or, you know, no charges or I'm released from everything, totally innocent, and that's what happened.

Q.  That was part of your agreement with Bob?

A.  I believe, yeah.

11

Q.  So if the jury came back with a conviction in April of 2016, the money wouldn't be owed?

A.  Absolutely, I would be out the money.

Q.  You would be out the money?

A.  I would be out that difference.

Q.  So one of the conditions of your agreement was that you not be found guilty of a crime in connection with the property?

A.  Guilty of anything.

Q.  And that's something that you and Mr. DeSalvio discussed?

A.  Yep.

Q.  And so that was a condition of your agreement?

A.  Again, the conversation was that you will find that I've done nothing wrong. I've broken no laws.  My reputation's clean.  You met me three or four times. You asked me questions about my family, my father, what your father did.  We went through all this stuff.  I was totally comfortable that this gentleman was a stand-up guy and we operated on good faith and a handshake deal was done.

Q.  A handshake deal –

A.  It happens all the time.

Q.  -- a handshake deal for between 18 and $19 million?

A.  I've done it for 9 and 10 million.

Q.   And with this one here, there was also a condition that you not be found guilty of any crime?

A.  Absolutely.  I was willing to roll the dice, as they say.

(Gattineri Dep. Tr. I:89-92).

The first sentence of paragraph 22 of the affidavit clearly contradicts the deposition testimony.  Nonetheless, Gattineri has provided a reasonably satisfactory explanation for the contradiction.  He contends that he conflated issues in the timeline of the San Diego agreement,

leading him to mistakenly testify that his innocence was a condition to that agreement.

Specifically, he points to the fact that he had not been indicted at the time of the San Diego

agreement.  (*Id.*)  He also points to the complaint in this matter, which sets forth the terms of the

San Diego agreement and does not include a condition of his innocence.  The second sentence of

paragraph 22 of his affidavit states that "[a]t the time of the San Diego Agreement on June 14,

2014, I was unaware of any impending indictments, and, having done nothing wrong, had no

reason to believe that I would be charged with or indicted for anything."  (Gattineri Aff. ¶ 22).

That discrepancy obviously raises a serious question concerning Gattineri's credibility,

and his explanation for the change is unquestionably weak.  Nonetheless, the explanation is

sufficiently satisfactory to avoid application of the sham-affidavit rule.  *See Hernandez-Loring*,

233 F.3d at 54; *Colantuoni*, 44 F.3d at 4-5.  Accordingly, the first sentence of paragraph 22 will

not be struck.

### C.      Paragraph 26

Defendants seek to strike paragraph 26 of Gattineri's affidavit, which states:

> Immediately after my acquittal of the federal charges on April 26, 2016, while still
> inside the courtroom, as I was walking out, I told Attorney Jacqui Krum, Senior
> Vice President and General Counsel of Wynn (who attended every day of my trial),
> that "[n]ow we can finish our business—up to you whether it's in the boardroom
> or the courtroom."

(Gattineri Aff. ¶26).

That conversation was not mentioned in his deposition testimony.  He testified as

follows:

> Q.  When did you talk with Jacqui Krum?
>
> A.  I don't know if it was a – I can't recall, but I definitely spoke to her.
>
> Q.  Was it in the last -- well, your criminal trial was in April of 2016. Was it before
>       or after April of 2016?

A.  I just don't recall.

Q.  Do you recall was it just one conversation with Ms. Krum?

A.  It may have been more than one.

Q.  Do you remember whether it was on the phone or in person?

A.  I don't.  One or two would have been in person, and I don't know if I was involved in any phone calls where she was calling in.  I don't -- I just don't recall.

Q.  Do you remember what you talked about?

A.  Not in particular.

(Gattineri Dep. Tr. I:20-21).  In his later deposition, he testified as follows:

Q.  So other than -- other than the communication at the Winchester Country Club with Mr. DeSalvio when you ran into him there in August or September of 2014, is my understanding of your testimony correct that from June 18th of 2014 until the time in 2016 after the Federal Court trial and after the nolle pros when you went over to the facility to find Mr. DeSalvio, you had no communication with anybody else from Wynn during that approximately two-year period?

A.  No.  I said I met with the Wynn head of security, FBI Agent Carazza.

Q.  You said that was after the nolle pros.

A.  I don't recall.  This is way too confusing for me.  I'm sorry. I'm doing the best I can.  So my answer is I don't recall.

(Gattineri Dep. Tr. II:102-03).  While the conversation he describes in his affidavit was not mentioned in his deposition, it does not clearly contradict in his testimony.  *Cf. Colantuoni*, 44 F.3d at 4-5.  He testified that he spoke with Ms. Krum several times, but that he could not recall the specifics of their conversations.  (Gattineri Dep. Tr. I:20-21).  A claimed lapse of memory is generally a sufficient reason to avoid the application of the sham affidavit rule.  *Hernandez-Loring*, 233 F.3d at 54.  Accordingly, paragraph 26 will not be struck.

14

**IV.**   <u>**Conclusion**</u>

For the foregoing reasons, defendants' motion to strike is DENIED.

**So Ordered.**


<u>/s/ F. Dennis Saylor IV</u>
F. Dennis Saylor IV
Dated:  January 13, 2022                    Chief Judge, United States District Court