# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                )
**ANTHONY GATTINERI,**                          )
                                                )
      **Plaintiff and**             )
      **Counterclaim-Defendant,**    )     **Civil Action No.**
                                                )     **18-11229-FDS**
  **v.**                                  )
                                                )
**WYNN MA, LLC,**                               )
                                                )
      **Defendant and**             )
      **Counterclaim-Plaintiff,**   )
                                                )
  **and**                                )
                                                )
**WYNN RESORTS, LIMITED,**                      )
                                                )
      **Defendant.**                )
_____)


## MEMORANDUM AND ORDER ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, C.J.**

     This is a contract dispute arising out of the sale of land for the construction of the Encore

Casino in Everett, Massachusetts.  Plaintiff Anthony Gattineri was a member of FBT Realty,

LLC, the limited liability company that owned the parcel at issue.  The complaint alleges that

Wynn originally contracted for an option to purchase the parcel for $75 million.  However, the

Massachusetts Gaming Commission raised concerns about the ownership of the land—

specifically, a concern that Charles Lightbody, a convicted felon and associate of La Cosa

Nostra, held a secret interest in the property.  The parcel also had substantial environmental

remediation issues that had not been resolved.  Wynn then entered into a new agreement to

purchase the land for $35 million that addressed the environmental issues.  The Gaming Commission also required the condition that the three members of FBT sign a certificate verifying that they would be the exclusive recipients of any sales proceeds.  FBT accepted the offer, and two of the three members signed the certificate.  Gattineri, however, refused to do so.

Without Gattineri's certification, Wynn could not get the necessary state approvals for a gaming license.  Gattineri claims that Wynn sent a representative to reach an agreement with him.  He alleges that an oral agreement was reached, that he would be "made whole" if he signed the certificate, which he interpreted to be a payment of about $19 million, based on a $75 million purchase price.  Gattineri signed the certificate on June 14, 2014.  He now complains that he has not been paid the $19 million he says he is owed.

Count 1 of the complaint alleges breach of contract.  Count 2 alleges unfair and/or deceptive trade practices in violation of Mass. Gen. Laws ch. 93A, § 11.  Count 3 alleges common-law fraud.

Defendants have moved for summary judgment.  As to Count 1, they contend that the breach-of-contract claim is insufficient as a matter of law because (1) the alleged agreement is an unenforceable illegal contract; (2) the terms of the alleged agreement are neither sufficiently definite nor certain; (3) the contract was not supported by valid consideration; (4) Gattineri was not ready, willing, and able to perform the contract because it was conditioned upon something indefinite over which he had no control; (5) there is no reasonable basis to compute his alleged damages; and (6) his alleged contractual counterpart, Robert DeSalvio, did not have the required authority to bind the defendants to the alleged agreement.  As to Count 3, defendants contend that the allegations of common-law fraud are insufficient to satisfy the heightened standard applied to fraud claims because (1) Gattineri's reliance on DeSalvio's authority was

unreasonable and (2) the alleged promise to "make [Gattineri] whole" is too vague.  As to Count 2, defendants contend that it derives entirely from the same set of operative facts as the legally unsupportable breach-of-contract and fraud claims, and because there are no unique arguments related to the Chapter 93A claim, it must also fail.

For the reasons stated below, the motion for summary judgment will be granted.

## I.      Background

The following facts are presented in the light most favorable to the non-moving party and are undisputed unless otherwise noted.

### A.      Factual Background

#### 1.      Parties

Anthony Gattineri is a 46.69% member of FBT Realty, LLC ("FBT"), a limited liability company.  (SDF, Ex. 1 ("Gattineri Aff.") ¶ 3).

Paul Lohnes is a member of FBT.  (Hill Dec. Ex. 2 ("Operating Agreement") at 35).

FBT owned the parcel of land (the "Parcel") located in Everett and Boston where the resort and casino, Encore Boston Harbor, is currently located.  (Complaint ¶ 6).

Wynn MA, LLC, is a limited liability company organized under the laws of Nevada with a principal place of business located in Las Vegas, Nevada.  Wynn MA, LLC is wholly owned by its sole member, Wynn Resorts, Limited.  (Complaint ¶ 2).

Wynn Resorts, Limited is a publicly traded Nevada corporation with a principal place of business located in Las Vegas, Nevada.  (Complaint ¶ 3).

#### 2.      Relevant Non-Parties

Encore Boston Harbor, a hotel and casino resort, is owned by Wynn MA, LLC, the Massachusetts licensee.  (Dkt. No. 164 at p. 6, Resp. to Order to Show Cause).

In January 2013, Encore filed an application with the Massachusetts Gaming

Commission ("the Commission") for a Region A Category 1 gaming license to operate a resort and casino in Massachusetts. (Complaint ¶ 9).

Robert DeSalvio joined Wynn Resorts Development, LLC as Senior Vice President of Development in March 2014. (Hill Dec. Ex. 3 ("Wynn Employment Agreement")). DeSalvio joined Encore as President in March 2018. (Hill Dec. Ex. 4 ("Encore Employment Agreement")).

DeSalvio reported to Matthew Maddox, Chief Financial Officer at Wynn, and Kim Sinatra, Senior Vice President and General Counsel at Wynn. (Hill Dec. Ex. 5, DeSalvio Dep. Tr. 72-73; Hill Dec. Ex. 8, Affidavit of Matthew Maddox ("Maddox Aff.") ¶ 6).

### 3.   **The Parcel**

On December 19, 2012, Encore and FBT entered into an Option Agreement that gave Encore the option to purchase the Parcel from FBT for $75 million. (Hill Dec. Ex. 6 ("Option Agreement")). Maddox signed the Option Agreement on behalf of Encore.[1]

Certain provisions in the Option Agreement required FBT to cooperate in the casino-licensing process. Specifically, Section 5.2 of the Option Agreement provided as follows:

> Seller and its Affiliates shall, at their sole cost and expense, reasonably cooperate with Purchaser with respect to any information it reasonably requires to complete the Casino Application and respond to any such inquiries throughout the licensing process.

(Option Agreement at Section 5.2.).

> "Affiliate" means, with respect to any Person, any other Person which, directly or indirectly, Controls, is Controlled by, or is under common Control with, such original Person.

(Option Agreement at Exhibit A). Section 13.13.5 of the Option Agreement provided:

---

[1] Gattineri was aware that Maddox signed it. (Option Agreement; Hill Dec. Ex. 9, Gattineri Dep. Tr. 67 ("I know [Maddox] signed it.")).

Seller represents and warrants to Purchaser that Seller and, to the best of Seller's knowledge, all Persons associated with Seller are willing to file all necessary applications to obtain whatever Approvals from the Gaming Regulatory Agencies may be required of such Persons in connection with this Agreement.  To the best of Seller's knowledge neither Seller nor any Person associated with Seller has ever engaged in any conduct or practices which any of the foregoing Persons should reasonably believe would cause such Person to be denied any such Approvals.

(Option Agreement at Section 13.13.5).  The term "Approvals" was defined as follows:

"Approvals" means all approvals, consents, licenses, permits, authorizations, orders, franchises, accreditations, certificates, variances, declarations, concessions, entitlements, waivers, exemptions waivers and similar items, including, without limitation, any license or approval under M.G.L. Chapter 91, a determination under the Massachusetts Environmental Policy Act ("MEPA"), or an Army Corps of Engineer's Permit under the Federal Clean Water Act.

(Option Agreement at Exhibit A).

When Encore and FBT entered into the Option Agreement, the Parcel required environmental remediation.  (Hill Dec. Ex. 9, Gattineri Dep. Tr. 137-38).  Section 5.7 of the Option Agreement required FBT to complete certain environmental cleanup activities on the Parcel, which were referred to as "Seller's Environmental Obligations."  (Option Agreement at Section 5.7).  Sections 5.7.1, 5.7.5, and 5.7.6 of the Option Agreement discuss the "Seller's Environmental Obligations" in detail.  In summary, the Option Agreement required  (1) Seller to diligently pursue, at the Seller's sole expense, a "Permanent Solution to any Releases of Oil and Hazardous Material at and From the Property" as soon as possible prior to closing; (2) Seller to reimburse Purchaser for reasonable out-of-pocket costs in the event of the Seller's breach; and (3) both parties to come to a mutually acceptable cost-sharing agreement related to the sharing of "any incremental costs" resulting from any releases of oil and hazardous material from the property.  (Option Agreement at Section 5.7.1., 5.7.5, 5.7.6).

On November 11, 2013, DeNunzio sent a letter to Jacqui Krum, Senior Vice President and General Counsel of Wynn, stating that "[U]nder Section 5.7.6 of the Option Agreement the parties have not been able to reach a mutually acceptable Environmental Cost-Sharing Agreement and that failure also gives rise to termination of the Option Agreement."  (Hill Dec. Ex. 11 ("DeNunzio Letter")).

Gattineri was copied on several e-mails in connection with the ongoing negotiations related to FBT's environmental clean-up obligations under the Option Agreement.  (Hill Dec. Ex. 13 ("Gattineri DeNunzio Email")).

On November 15, 2013, Gattineri e-mailed his personal attorney, Daniel Doherty, stating "I have no intention of cost sharing 30,000,000 [sic] for clean up because they want to disturb waterside . . . Wynn and us are not anywhere near on the same page . . . ."  (Hill Dec. Ex. 15 ("Gattineri Doherty Email")).

### 4.      FBT Membership Concerns

At some point, the Gaming Commission began to express concerns that Charles Lightbody, a convicted felon and reputed associate of La Cosa Nostra, may have held a secret interest in FBT.

Under Mass. Gen. Laws ch. 23K, § 12, the Investigations and Enforcement Bureau of the Commission ("IEB") was required to conduct a suitability investigation of each applicant for a gaming license, including Encore and Wynn.  IEB was directed to conduct a review of the Option Agreement with FBT and to prepare a report.  (Hill Dec. Ex. 20).

In connection with the IEB's suitability investigation, on July 10, 2013, Gattineri was interviewed by Detective Brian Connors and Lieutenant Kevin Condon of the Massachusetts State Police about his involvement in FBT.  (Hill Dec. Ex. 21).

On August 1, 2013, Kevin Tourek, Compliance Officer at Wynn, sent a letter to

DeNunzio, stating:

> Certain regulatory concerns have been expressed with respect to the ownership of
> FBT Everett Realty, LLC ("FBT").  On January 17, 2013, you advised Kim
> Sinatra in writing that the sole equity owners of FBT were yourself, Paul Lohnes
> and Anthony Gattineri.  Can you please confirm any other direct or indirect equity
> participants since FBT took title to the property, indicating the period of
> ownership of each person?  We would appreciate your response on or before
> August 10, 2013.

(Hill Dec. Ex. 17 ("Tourek Letter")).

On August 12, 2013, DeNunzio replied to the Tourek letter as follows:

> I write in response to your letter dated August 3, 2013.  On October 9, 2009, FBT
> Everett Realty, LLC ("FBT") was organized by the filing of a Certificate of
> Organization with the Massachusetts Secretary of State.  On October 15, 2009,
> FBT recorded the Deed to the Everett Property.  The direct or indirect ownership
> of FBT since FBT took title is as follows:  The owners of FBT in 2009 and 2010
> were Paul Lohnes, Anthony Gattineri, Gary DeCicco and Charles Lightbody.  In
> 2011, The DeNunzio Group, LLC became an additional owner of FBT.  Dustin
> DeNunzio is the 100% owner of The DeNunzio Group, LLC.  Gary DeCicco
> agreed to relinquish the extent of his ownership interest in FBT in early 2012.
> Prior to the execution of the Option Agreement with Wynn on December 19,
> 2012, Charles Lightbody also agreed to transfer all of his ownership interest in
> FBT to Anthony Gattineri.  Since before December 19, 2012, and through the
> present, the sole equity owners (direct or indirect) of FBT have been Paul Lohnes,
> Anthony Gattineri and The DeNunzio Group, LLC.

(Hill Dec. Ex. 18 ("DeNunzio Letter")).

On September 5, 2013, the IEB served Gattineri with a subpoena for testimony and

records relating to the transfer of any interest in or property owned by FBT and/or between

Gattineri and Lightbody.  (Hill Dec. Ex. 22).

On October 15, 2013, the IEB attempted to interview Gattineri.  He asserted his Fifth

Amendment rights.  (Hill Dec. Ex. 9, Gattineri Dep. Tr. 62, 196-197).

Gattineri contends that he acquired Charles Lightbody's 12.05% membership interest in FBT through a Memorandum of Transfer and Promissory Note for $1.7 million. (Hill Dec. Ex. 19).

The Suitability Report was issued on December 6, 2013. It set forth "the findings of fact relative to [the suitability] investigation." (Hill Dec. Ex. 20 ("Suitability Report") at p. 8). In part, the Suitability Report "details concerns regarding the sellers of the property for the proposed casino site." (*Id.*)

5.      **Ninth Amendment to the Option Agreement**

In early November 2013, Encore and FBT were still negotiating FBT's environmental remediation obligations. (Hill Dec. Ex. 10, DeNunzio Dep. Tr. 85, 145-47).

Gattineri was copied on several emails in connection with the ongoing negotiations related to FBT's environmental cleanup obligations under the Ninth Amendment. (Hill Dec. Ex. 28-30).

On November 21, 2013, FBT's attorney, Paul Feldman, emailed representatives from Wynn and Encore with the following offer: "Price is reduced to $31 million; Wynn takes over 100% of environmental and receives an assignment of the Pharmacia Judgment [a court judgment concerning environmental cleanup responsibilities]." (Hill Dec. Ex. 26).

According to DeNunzio, defendants and FBT "never determined [FBT's environmental remediation] responsibilities in the original Option Agreement, so [they] could never fully quantify how that it [sic] would be." (Hill Dec. Ex. 10, DeNunzio Dep. Tr. 145-47). For example, the defendants and FBT never finalized how the Pharmacia Judgment would be allocated under the Option Agreement. (*Id.*)

Effective November 26, 2013, Encore and FBT entered into a Ninth Amendment to the

Option Agreement.  (Hill Dec. Ex. 7 ("Ninth Amendment")).[2]  Sinatra signed the Ninth Amendment on behalf of Encore.  (*Id.*).  Under the Ninth Amendment, Encore and FBT agreed "to amend the Agreement on the terms and conditions set forth below including, without limitation, to reduce the Purchase Price" to $35 million.  (*Id.* at Recitals F).

The Ninth Amendment also changed Section 5.7 of the Option Agreement related to "Seller's Environmental Obligations."  (*Id.* at Section 4).  Under the Ninth Amendment, Encore and FBT agreed that "In all events Seller's monetary obligation for the Phase III Scope of Work shall not exceed" $10 million.  (*Id.* at Section 5.7.2).  In summary, $10 million of the purchase price was to be placed in escrow for the cost of the Seller's Environmental Obligations and for the cost and completion of certain reports required by the Massachusetts Department of Environmental Protection (DEP), as specified in Section 5.7.3.  (*Id.*).  In addition, Section 5.7.6. clarified that to the extent the Seller completes any of the activities specified in 5.7.3 (Phase III environmental work, DEP reports, etc.) the $10 million amount should be reduced by the amount already expended.  (*Id.*).

### 6.    The Commission's Approval of the Ninth Amendment

On December 5, 2013, Encore and Wynn filed a petition to "request a response from the Commission regarding a proposed resolution to concerns raised by the [IEB] . . . about undisclosed interests in FBT."  (Hill Dec. Ex. 31).  The December 5 petition stated:

> 5.  Wynn commissioned an appraisal of the fair market value of the Property with the following assumptions:  (i) that the Property would not be used for gaming purposes and (ii) that the environmental condition of the Property would be suitable for general commercial uses.  Based on the foregoing assumptions, the appraisal valued the Property at [$35 million].

---

[2] Gattineri did not sign the Ninth Amendment.  (Ninth Amendment).  Gattineri objected to the $40 million price reduction, but as a 46.69% membership interest holder in FBT, he could not stop FBT from entering into the agreement.  (SDF, Ex. 13, Gattineri Dep. Tr. 281; SDF. Ex. 14, Doherty Dep. Tr. 57-58).

6.  Wynn and FBT amended the Option Agreement to reduce the Purchase Price
to [$35 million], the appraised value of the Property based upon the relevant
assumptions.

7.  With respect to the required environmental remediation, Wynn and FBT agree
that environmental remediation necessary to bring the Property into regulatory
compliance and make the Property suitable for general commercial purposes is
approximately [$10 million].  Therefore, pursuant to the terms of the revised
Option Agreement, if Wynn exercises the option, Wynn will deposit [$10 million]
of the Purchase Price into an escrow account to be used for Phase III
environmental remediation.  To the extent that the actual amount of the Phase III
remediation is less than [$10 million], any remaining amounts will be paid to
FBT.

(*Id.*).

On December 13, 2013, the Commission held a public hearing that considered the

proposal to reduce the purchase price of the Parcel from $75 million to $35 million.  (Hill Dec.

Ex. 32).  At the hearing, the Commission approved the following motion:

COMMISSIONER MCHUGH: All right.  So then, I move that the commission
accept the resolution proposed by Wynn Mass to the issues that arose out of the
land transaction about which we've heard today, with the essential ingredients
that were outlined.

That is that the sale price be 35 - - no more [than] $35 million with the $10
million proviso for cleanup cost, net - - net of the $10 million or whatever portion
of that needs to be spent on - - on cleanup costs, number one.

Number two, that the three members of FBT, LLC, who are nominally going to
receive the proceeds be required to sign a document saying they are the exclusive
recipients of the proceeds, and that they do that on a notarized document under
oath.

(*Id.*).  The Commission instructed the IEB "to deliver its entire file . . . to the U.S. Attorney, the

district attorney for Suffolk County, and the attorney general."  (*Id.*)

On December 13, 2013, Gattineri's personal attorneys, Jeffrey Doherty and Bradford

Bailey, notified Gattineri of the Commission's conditions, including the condition that the three

members of FBT who were reflected on Schedule 3 of the Ninth Amendment would be required

to sign a document verifying that they would be the exclusive recipients of the proceeds, and that

they do so under oath.  (Hill Dec. Ex. 33).

On December 23, 2013, FBT members Paul Lohnes and Dustin DeNunzio signed the

Certificate in the form of a "Confirmation of Representation."  That document stated as follows:

> The undersigned being duly sworn, state and reaffirm, that to the best of their
> knowledge, the Representations of Seller set forth in Section 5 of the Ninth
> Amendment to Option Agreement dated November 26, 2013, by and between
> FBT Everett Realty, LLC, a Massachusetts limited liability company ("Seller")
> and Wynn MA, LLC, a Nevada limited liability company ("Purchaser") as
> follows:
>
> 5.  Representations of Seller.  To induce Purchaser to execute, deliver and
> perform its obligation under the Agreement, Seller hereby represents the
> following on and as of the Amendment Effective Date and on and as of the
> Closing Date:
>
> Schedule 3 is a true and accurate list of (i) each person with a legal or beneficial
> ownership interest direct or indirect, in Seller (a "Beneficiary"), (ii) the
> percentage interest in Seller of each such Beneficiary, and (iii) the address of each
> Beneficiary.  Neither Seller nor any Beneficiary has made, or has any agreement
> whether oral or written to make any payments to any other person or entity for the
> proceeds of the Agreement including, without limitation, any of the option
> payments made pursuant to Section 2.2 or any portion of the Purchase Price.

(Hill Dec. Ex. 36).

As of December 2013, however, Gattineri had refused to sign the Certificate.

### 7.     June 14, 2014 San Diego Meeting

On June 14, 2014, Gattineri and DeSalvio met at the Westgate Hotel in San Diego,

California.  (Hill Dec. Ex. 9, Gattineri Dep. Tr. 56-57; Hill Dec. Ex. 5, DeSalvio Dep. Tr. 61-67).

According to Gattineri, he asked DeSalvio if he had authority to enter into an agreement on

behalf of Wynn, and DeSalvio replied that he did.  Gattineri concedes that he did not ask for any

evidence to support that statement.  (Hill Dec. Ex 9, Gattineri Dep. Tr. 65).  Gattineri explained,

"I mean, he had authority to do it, you know.  It was almost—it was almost too casual.  You

know, he wouldn't put, he wouldn't put it in writing."  (Dkt. No. 148, Ex. 2, Gattineri Dep. Tr.

68-69).

Gattineri contends that he and DeSalvio made the following agreement (the "San Diego Agreement"):  "If Anthony Gattineri signed the required certificate and Wynn obtained the casino license for a casino on the FBT property, Wynn would make Anthony Gattineri whole." (Complaint ¶ 45; Hill Dec. Ex. 9, Gattineri Dep. Tr. 74, 88).

According to Gattineri, the amount that would make him "whole" was around $19 million:

> Q.      Did you and Mr. DeSalvio talk about a particular amount?
>
> A.      I think I said it was around $19 million or 19 million.  I didn't know the exact dollar.
>
> Q.      How did you make the calculation?
>
> A.      Well, I took the $75 million, and I multiplied it, obviously, by around 48 percent, and I came with around 18 and a half, $19 million.
>
> Q.      Did you have a specific amount that you and Mr. DeSalvio had discussed?
>
> A.      Not to the penny.
>
> Q.      To the dollar?
>
> A.      I think what I said, it was around $19 million or that comment.

(Hill Dec. Ex. 9, Gattineri Dep. Tr. 64).  Gattineri's calculation was based on a 46.69% share (his ownership interest in FBT) of the $40 million price reduction (apparently $18,676,000).

Gattineri's estimate of $19 million did not account for any environmental-cleanup obligation that FBT had under the original Option Agreement.  (*Id.* at 64-65, 109).  He also testified how he would calculate what it would mean to make him "whole" as follows:

> Q.      And -- and how were you going to calculate what that means to make you whole?  What -- what were you going to do?

A.      I would probably just do some simple math and have someone
        with a better math background than I am, I'm not very good with
        math.  And calculate the, whatever, the 46.7 at $75 million and
        that's what I'm owed.  That's what I need to make me whole.

Q.      What adjustment would you make for the seller's obligation under
        the original option agreement to perform environmental work?

A.      I wouldn't be doing any of that.  I think – I think Wynn – I think
        Wynn knew the environmental issue.  I don't really know what
        they were doing with Monsanto and the agreements they were
        making.  I have no idea.

Q.      You have no idea what obligations FBT assumed under the
        original option agreement for seller's environmental cleanup?

A.      I don't recall if, if we were responsible for any of it or it was --it
        seemed like it. I have no idea how much the money was.

(Hill Dec. Ex. 38, Gattineri Dep. Tr. 32).

He also testified that there may have been other ways to make him "whole":

Q.      That was one of the ways to make you whole would be that Wynn
        possibly would buy real estate that you had an interest in?

A.      Yeah, they have a real estate division under some development
        company that they could do it that way.

Q.      So they could buy the property?

A.      I don't know how they do.  They know how to do it they said.

Q.      Is that one of the things that you and Mr. DeSalvio talked about,
        the possibility that after you got cleared of the investigation that if
        you had other real estate in the greater Boston area perhaps Wynn
        could become a purchaser of that real estate; is that something you
        guys talked about in San Diego?

A.      We talked about it at different times.  If I was cleared and found
        100 percent exonerated and not guilty, you could definitely get
        something done.

Q.      And one of the ways to get something done might have been that
        Wynn could buy some property that you had for sale in the area?

> A.   Very possibly be that.  That would be up to them.  They have all
>      kinds of ways to do it.

(*Id.* at 112-13).

Gattineri did not agree to sign the Certificate during the meeting in San Diego.  However, a few hours after the meeting, he notified DeSalvio that he would sign the Certificate.  (Gattineri Dep. Tr. II:73; Hill Dec. Ex. 5, DeSalvio Dep. Tr. 76).  He signed the Certificate on June 14, 2014, the day of the meeting.  (Hill Dec. Ex. 39).

On June 18, 2014, Jeffrey Doherty sent a copy of the Certificate to the Commission. (*Id.*).  Encore obtained the gaming license from the Commission in September 2014 and purchased the Parcel shortly after, pursuant to the Ninth Amendment, for approximately $35 million.  Gattineri was not paid the $19 million he claimed he was owed.  If he had been paid that amount, the purchase price for the parcel would have been more than $35 million, in contravention of the motion approved by the Commission on December 13, 2013.

### 8.   The Indictments of Gattineri

On October 1, 2014, Gattineri (along with DeNunzio and Lightbody) was indicted in the United States District Court for the District of Massachusetts for conspiracy to commit wire fraud and wire fraud.  (Hill Dec. Ex. 37 ("Indictment")).  In substance, the indictment alleged that DeNunzio, Gattineri, and Lightbody conspired to defraud Wynn and the Gaming Commission by concealing Lightbody's financial interest in the Everett parcel.  (*Id.*).

On October 20, 2014, Gattineri was indicted on separate state-court charges.  Gattineri was arraigned in Massachusetts state court on charges of impeding a gaming investigation, conspiracy, and tampering with evidence.  (*Commonwealth v. Gattineri*, No. 1484-CR-01353).

On April 29, 2016, after a jury trial, Gattineri was acquitted on all federal charges.

(*United States v. DeNunzio*, No. 14-CR-10284, Dkt. No. 516).

On September 29, 2016, the prosecution entered a *nolle prosequi* in Gattineri's state-court case.  (*Commonwealth v. Gattineri*, No. 1484-CR-01353).

### 9.    Chapter 93A Demand Letter

On April 11, 2018, representatives of Wynn and Encore received a letter from counsel for Gattineri alleging that Wynn and Encore had breached a contract with Gattineri, and that Wynn and Encore engaged in "unfair and/or deceptive trade practices in violation" of Mass. Gen. Laws ch. 93A.  (Hill Dec. Ex. 40).   The demand letter alleged that Wynn breached the following contract:

> [O]n June 14, 2014 . . . Wynn, through its duly authorized representative Robert DeSalvio, offered Anthony Gattineri to "make him whole" on Anthony Gattineri's loss of $18,676,000 (46.69% of $40 million) if
>
> (a) Anthony Gattineri signed a Certificate that Wynn needed to present to the Massachusetts Gaming Commission (the "Gaming Commission") in order for Wynn to obtain a casino license for the FBT property in Everett (the "FBT Property") upon which Wynn had an Option to Purchase; and
>
> (b) So long as Anthony Gattineri had committed no crime in connection with the sale of the FBT Property to Wynn.

(*Id.*)

### B.    Procedural Background

On June 12, 2018, Gattineri filed this action against Wynn MA, LLC and Wynn Resorts, Limited.  The complaint asserts three counts:  breach of contract (Count 1), unfair and/or deceptive trade practices in violation of Mass. Gen. Laws ch. 93A, § 11 (Count 2), and common-law fraud (Count 3).  (Complaint ¶¶ 50-69).  It alleges that "Wynn has breached its contract with Mr. Gattineri by failing to make him whole by providing him with his 46.69% share of the $40 million price reduction windfall that Wynn received."  (*Id.* ¶ 50).  And it alleges that "Wynn engaged in unfair and/or deceptive trade acts or practices by engineering, and then executing, a

15

plan to intimidate, threaten and otherwise harass Mr. Gattineri until he signed the Certificate."
(*Id.* ¶ 54).  It finally alleges that "Wynn made a false representation to Mr. Gattineri and Wynn
had knowledge of the falsity of its representation" and that "the sole purpose of Wynn's false
representation to Mr. Gattineri was to induce Mr. Gattineri to sign the Certificate" and that "Mr.
Gattineri relied on Wynn's representation as true and acted upon it by signing the
Certificate . . . "  (*Id.* at ¶¶ 66-68).

On February 20, 2020, defendants moved for summary judgment as to all counts.

## II.   Legal Standard

The role of summary judgment is to "pierce the pleadings and to assess the proof in order
to see whether there is a genuine need for trial."  *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822
(1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the
moving party shows that "there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue is "one that
must be decided at trial because the evidence, viewed in the light most flattering to the
nonmovant, would permit a rational factfinder to resolve the issue in favor of either party."
*Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).
"Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to
make a showing sufficient to establish the existence of an element essential to that party's case,
and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys., Inc.*,
50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).
In making that determination, the court must "view the record in the light most favorable to the
nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20,
25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the
adverse party must set forth specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and footnotes omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.  Affidavits submitted in opposition to a motion for summary judgment will be considered as evidence unless the movant separately moves (and the court grants) a motion to strike their contents in whole or in part.  *See* 10B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2738 (4th ed. 2021).

**III.**    **Analysis**

    **A.**    **Count 1:  Breach of Contract**

Count 1 alleges that defendants breached a contract with Gattineri—specifically, the San Diego Agreement—by "failing to make him whole by providing him with his 46.69% share of the $40 million price reduction windfall that Wynn received."  (Complaint ¶ 50).  Defendants contend that summary judgment should be granted as to Count 1 because (1) the alleged agreement is an unenforceable illegal contract; (2) Gattineri cannot prove he sustained damages as a result of defendants' breach of the alleged agreement; and (3) defendants' representative, DeSalvio, lacked actual or apparent authority to bind defendants to an agreement.  (Def. Mem. at 15-23).  In addition, defendants contend that Gattineri cannot prove that a valid contract between the parties existed because (1) the material terms of the agreement are indefinite and uncertain; (2) the agreement is not based on valid consideration; and (3) the agreement is conditioned on a condition precedent that is "indefinite" and "something over which the promisee [Gattineri] has no control," such that "Gatinneri cannot demonstrate that he [is] 'ready, willing, and able to perform.'"  (*Id.* 5-16).

Because the Court finds that the alleged San Diego Agreement is an unenforceable illegal contract and, even if it were not, the terms are not sufficiently definite or certain to form the basis

of a valid contract, defendants' other contentions as to Count 1 need not be addressed.

### 1.    Illegality of Contract

Defendants contend that the alleged San Diego Agreement is an unenforceable illegal contract because it directly contravenes a Commission directive in violation of Mass. Gen. Laws ch. 23K.  Gattineri contends that even if the alleged agreement violates Chapter 23K, it is still enforceable because the parties are not *in pari delicto*.

Under Massachusetts law, a contract is unenforceable when an illegality constitutes an essential element of the contract.  *Health Care Collection Servs., Inc. v. Protocare, Inc.*, 1995 WL 96911, at *2 (D. Mass. Feb. 24, 1995).  "[I]t has . . . long been settled that the law will not aid either party to an illegal contract to enforce it against the other, neither will it relieve a party to such a contract . . . who seeks to reclaim his money or whatever article of property he may have applied to such a purpose."  *Atwood v. Fisk*, 1869 WL 5631, at *2 (Mass. Jan. 1, 1869).

Whether an agreement constitutes a valid enforceable contract is a purely legal question. *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toldeo*, 966 F.3d 46, 56-57 (1st Cir. 2020). "Whether a contract made in violation of a statute is void depends upon the terms of the statute and the nature of the violation. . . . [I]f a statute does not expressly provide that a contract made in violation of its terms is invalid, the contract will be deemed void if doing so is necessary to accomplish the statute's objectives."  *Baltazar Contractors, Inc. v. Town of Lunenburg*, 65 Mass. App. Ct. 718, 720-21 (Mass. App. Ct. 2006).

Massachusetts General Laws ch. 23K, §21(c) grants the Commission the power to put conditions or restrictions on each gaming license.  Chapter 23K, §21(b) provides in relevant part:

> No person shall transfer a gaming license, a direct or indirect real interest, structure, real property, premises, facility, personal interest or pecuniary interest under a gaming license issued under this chapter or enter into an option contract, management contract or other agreement or contract providing for such transfer in the present or future, without the notification to, and approval by, the commission.

Here, the alleged agreement provided that if "Gattineri signed the required Certificate and Wynn obtained the casino license for a casino on the FBT Everett property, Wynn would 'make Anthony Gattineri whole' by providing him with his percentage of the reduced purchase price, which is in the amount of $18,676,000." (Complaint ¶ 45). The primary reasons for the reduction in the purchase price were environmental cleanup issues and regulatory concerns expressed by the IEB with respect to the ownership of FBT. (Hill Dec. Ex. 17, 20, 21). FBT and Encore then entered into the Ninth Amendment, which reduced the purchase price of the Parcel from $75 million to $35 million and addressed the issue of responsibility for environmental cleanup matters. The Commission approved that arrangement, provided that the price was no more than $35 million, and that the members of FBT, including Gattineri, sign a certificate swearing that they were the exclusive recipients of the proceeds. (Hill Dec. Ex. 32).

The alleged agreement violates Chapter 23K for two reasons. First, it contravenes the Commission's specific approval of the price reduction to "no more [than] $35 million" by effectively reinstating the $75 million purchase price with respect to Gattineri without the Commission's approval.[3] Second, the basis of the agreement is Gattineri's signing of the certificate, which was a requirement mandated by the Gaming Commission. Gattineri's use of the certificate as consideration for the contract, without the Gaming Commission's approval, is a contract "or other agreement" for transfer of a "personal or pecuniary interest under a gaming license" which is prohibited by Chapter 23K "without [] notification to, and approval by, the

---

[3] Defendants contend that the agreement also circumvents the Commission's requirement that Gattineri sign a certificate swearing that he was the exclusive recipient of the proceeds because there is nothing in the agreement that would prevent Gattineri from sharing the $18,676,000 with undisclosed third parties. (Defs. Mem. at 22). However, Gattineri did in fact sign the Certificate required by the Commission, albeit with respect to the $35 million purchase price. (SDF Ex. 21). There was no specific requirement to sign such a certificate with respect to any additional payment. There was, of course, no need for such a requirement, considering that any additional payment would in itself contravene the Commission's approval of the price reduction.

commission."

Gattineri argues that even if the San Diego Agreement violates Chapter 23K, it is still enforceable because the parties are not *in pari delicto*.  The general rule that a court leaves parties to an illegal contract in the same position as it finds them is subject to an exception:

> [W]here the parties are not in equal fault as to the illegal element of the contract, or, to use the phrase of the maxim, are not in pari delicto, and where there are elements of public policy more outraged by the conduct of one than of the other, then relief in equity may be granted to the less guilty.

*Arcidi v. Nat'l Ass'n of Gov't Emps., Inc.*, 447 Mass. 616, 620 (internal quotations omitted) (Mass. 2006).  When the parties are not *in pari delicto*, actions may be maintained to recover consideration received under an illegal contract, although the contract itself cannot be sued on. *Thomas v. City of Richmond,* 79 U.S. 349, 356 (1870).  If the provision of law rendering the contract illegal "was clearly intended to benefit one party over the other, i.e., the public policy is intended to protect persons of the class to which one party belongs," equitable relief may be granted to the party that the public policy is intended to protect, even though the illegal contract will not be enforced.  *Acridi*, 447 Mass. at 620.  For example, in *Council v. Cohen*, 303 Mass. 348 (Mass. 1939), the court held that a second mortgage was invalid as prohibited by the Home Owner's Loan Act, but nonetheless allowed the homeowner plaintiff to recover interest paid on the mortgage because the parties were not *in pari delicto* and the act's "intent is to aid the home owner and not the mortgagee."  *Id.* at 355.

Here, regardless of whether the parties are *in pari delicto*, Chapter 23K is not intended to protect persons of the class to which Gattineri belongs; rather, "ensuring public confidence in the integrity of the gaming licensing process and in the strict oversight of all gaming establishments through a rigorous regulatory scheme is the paramount policy objective of [] chapter [23K]." Mass. Gen. Laws ch. 23K, § 1(1).  Indeed, Gattineri's alleged secret side agreement is the kind

20

of conduct the law seeks to prevent.

In summary, the agreement violates Mass. Gen. Laws ch. 23K and is therefore void as an illegal contract.  *Baltazar*, 65 Mass. App. Ct. at 721.

### 2.      Indefinite and Uncertain Material Terms

Defendants further contend that the alleged contract is unenforceable because an essential term, the price to be paid, is indefinite.  Gattineri alleges in response that Wynn promised to "make him whole" and that Wynn knew this meant 46.69% (Gattineri's ownership percentage) of the $40 million price reduction.  (Complaint ¶ 45; Pl. Mem. at 5).  He alleges that he accepted this offer and that he and DeSalvio shook hands on their agreement, forming a binding contract.

In order to prevail on a breach of contract claim under Massachusetts law, plaintiff "must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiffs sustained damages as a result of the breach."  *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir.2007).

As to the first element—that is, whether there is a valid contract— "[a]ll the essential terms of a contract must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined."  *Cygan v. Megathlin*, 326 Mass. 732, 733-734 (1951); *see also Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 878 (2000) ("It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement.").  It is not necessary for all terms to be precisely defined.  *Conway v. Licata*, 104 F. Supp. 3d 104, 113 (D. Mass. 2015) (internal citations omitted).  "An agreement may have some indefinite terms and still be enforceable, but the terms that do exist must be sufficiently definite that the court could give an exact meaning to the agreement and could enforce it."  *Green Earth Energy Photovoltaic Corp.*

21

*v. KeyCorp*, 2020 WL 1816379 at *6 (D. Mass. Jan. 10, 2020).  That is, the parties must "have

progressed beyond the stage of 'imperfect negotiation.'"  *Situation Mgmt. Sys., Inc.*, 430 Mass. at

878 (quoting *Lafayette Place Assocs. v. Boston Redev. Auth.*, 427 Mass. 509, 517-518 & n.9

(1998)).  "The issue of [w]hether an alleged contract is legally enforceable in light of indefinite

terms is a question of law for the court."  *Cooper v. Kenexa Tech., Inc.*, 2012 WL 2946012, at *4

(D. Mass. July 19, 2012) (internal quotation marks omitted).

Here, the essential term of the alleged agreement—that is, what would make Gattineri

"whole"—indefinite and uncertain.  According to Gattineri, the alleged agreement that Wynn

would "make him whole" meant paying him a percentage of the reduced purchase price,

amounting to approximately $18,676,000.  However, there is no evidence that he and DeSalvio

even discussed those numbers, much less agreed to them.  Gattineri also testified that he did not

know how the price would be adjusted to take into account the environmental-cleanup obligation

that FBT had under the original Option Agreement.  (Hill Dec. Ex. 9, Gattineri Dep. Tr. 64-65,

109).

To underscore the vagueness of the alleged agreement, Gattineri testified that there may

have been other ways to make him "whole."  (Hill Dec. Ex. 38, Gattineri Dep. Tr. 112-113).  For

example, he testified that Wynn could make him "whole" by buying unidentified property that he

had for sale in the area.  (*Id.*).  Even then, Gattineri said that such a deal could get "done" only *if*

he were exonerated in his criminal matter.  (Hill Dec. Ex. 9, Gattineri Dep. Tr. 90-92).

Where the terms of an agreement are insufficiently definite such that the court cannot

give an exact meaning to the agreement, the material terms cannot provide the basis for a valid

contract.  *KeyCorp*, 2020 WL 1816379 at *6.  Here, the essential term of the alleged

agreement—the amount to be paid to Gattineri in return for his signature—is indefinite and

22

uncertain.  It therefore cannot form the basis of a valid and enforceable contract.

Accordingly, the Court will grant defendants' motion for summary judgment as to Count 1.

**B.      Count 3:  Common-Law Fraud**

Defendants contend that the Court should grant summary judgment as to Count 3, the common-law fraud claim, because Gattineri's reliance on the alleged misrepresentations is unreasonable.  According to Gattineri, he signed the certificate in reliance on the false representation that Wynn would make him "whole."

To prove a claim for common-law fraud, a plaintiff must show that (1) the defendant made a false representation of material fact; (2) with knowledge of its falsity; (3) for the purpose of inducing the plaintiff to act in reliance thereon; (4) plaintiff relied upon the representation; and (5) plaintiff acted to his detriment.  *Kilroy v. Barron*, 326 Mass. 464, 465 (1950); *Rodi v. Southern New England School of Law*, 532 F.3d 11, 16 (1st Cir. 2008) (applying Mass. law).  In addition, plaintiff's reliance on the alleged false representation must be reasonable under the circumstances.  *Collins v. Huculak*, 57 Mass. App. Ct. 387, 392 (2003).

Generally, whether reliance by a plaintiff is reasonable is a question of fact for the jury; however, a court may find as a matter of law that a plaintiff's reliance was unreasonable.  *Saxon Theatre Corp. of Boston v. Sage*, 347 Mass. 662, 666-67 (1964).  Reliance on statements that are vague, indefinite, or imprecise is unreasonable.  *See Boyle v. Douglas Dynamics, LLC*, 99 Fed. Appx. 243, 247 (1st Cir. 2004) (applying Mass. law) (holding that defendant's statements were "too general to justify reliance"); *In re Lernout & Hauspie Securities Litigation*, 286 B.R. 33, 42-43 (D. Mass. 2002) (finding that reliance on "vague statements would not be reasonable"); *Warren H. Bennett, Inc. v. Charlestown Sav. Bank*, 3 Mass. App. Ct. 753 (1975) (holding that

"the representation allegedly relied upon was so indefinite and imprecise as to render such reliance unreasonable as a matter of law").

For example, in *Masingill v. EMC Corp.*, 449 Mass. 532, 540 (2007) the court held that it is unreasonable as a matter of law to rely on prior oral representations that were specifically contradicted by the terms of a written contract.  And in *Saxon*, 347 Mass. 662, plaintiff's reliance was found to be unreasonable because essential terms of the agreement were undecided.  There, defendants had agreed to build a theatre and give a long-term lease to the plaintiff.  *Saxon*, 347 Mass. at 667.  However, the court found that essential terms of the lease had not yet been stated or settled, which meant any reliance on such terms was unreasonable as a matter of law.  *See id.* at 667 ("The proposed lease would involve detailed negotiations and it might turn out that no lease acceptable to the parties could be worked out.").

Here, as noted, the essential term of the alleged agreement between Gattineri and defendants was imprecise and undecided.  What would make Gattineri "whole" was entirely unclear—indeed, it was never even discussed.  Under the circumstances, Gattineri's claimed reliance on defendants' representations was unreasonable as a matter of law.  Accordingly, the Court will grant defendants' motion for summary judgment as to Count 3.

C.      **Count 2:  Mass. Gen. Laws ch. 93A**

Defendants contend that because Gattineri's breach-of-contract and common-law fraud claims fail as a matter of law, so too must his Mass. Gen. Laws ch. 93A claim.

Where a Chapter 93A claim is wholly derivative of a claim under common law, statute, tort, or contract, and summary judgment is granted as to that claim, summary judgment should normally be granted as to the Chapter 93A claim, as well.  *See FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 108 (1st Cir. 2009) ("Plaintiffs' chapter 93A claim is based wholly on its

common-law claims. Because these underlying claims fail . . . summary judgment was properly granted as to the chapter 93A claim."); *Professional Servs. Group, Inc. v. Town of Rockland*, 515 F. Supp. 2d 179, 194 (D.Mass.2007) ("To the extent a party's Chapter 93A claims are based only on failed common law or statutory grounds, several courts have refused to find Chapter 93A liability."); *see also Cantell v. Hill Holliday Connors Cosmopulos, Inc.*, 55 Mass. App. Ct. 550, 556 (2002) ("Since CCI's . . . 93A claim is derivative of its breach of contract and quantum meruit claims, that claim was properly dismissed."); *Murphy v. Nat'l Grange Mut. Ins. Co.*, 2014 WL 5307671, at *6 (D. Mass. Oct. 16, 2014) ("Summary judgment as to the underlying contract claim forecloses a derivative chapter 93A claim.").

Here, the Chapter 93A claim derives entirely from the same set of facts as the breach-of-contract and common-law fraud claims.  Because the complaint fails to state claims for breach of contract and common-law fraud, summary judgment will be granted as to the Chapter 93A claim.

## IV.    Conclusion

For the foregoing reasons, defendants' motion for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  January 13, 2022                Chief Judge, United States District Court

25